## In re CARTER.

No. B-2092.

District Court, E. D. Washington, S. D.

May 17, 1941.

George O. Beardsley, of Prosser, Wash., for debtor.

Moulton & Powell, of Kennewick, Wash., for H. S. Murray and A. L. Grover.

B. E. McGregor, of Prosser, Wash., for J. Q. Hamby.

Judd D. Kimball, of Walla Walla, Wash., for Pacific Coast Joint Stock Land Bank of Portland, Ore.

SCHWELLENBACH, District Judge.

This matter comes up on the debtor's objections to findings of fact and conclusions of law of Andrew Brown, Special Master. The reference to the Master was made in order that testimony might be taken on the amended motion of H. S. Murray and A. L. Grover and the motion of the Pacific Coast Joint Stock Land Bank, a corporation, and of J. Q. Hamby. While the three motions are different in form, in each of them the object sought is to secure the dismissal of the debtor's petition on the ground that he is not a farmer, that he did not file the petition in good faith, and that he is not the owner of or entitled to the possession of the real property involved in these proceedings. The testimony taken and the exhibits admitted in evidence were brought up with the findings and conclusions of the Special Master in support of the Special Master's recommendation that the debtor's petition should be dismissed.

The debtor's objections to the Special Master's report go to the details of the findings of fact and to the fact that the conclusions of law were inserted by the Master although the Order of Reference did not require them. Because of the complicated nature of the situation and the serious import of the Master's recommendations, I have reviewed in detail the files both of this Court and of the Master and the testimony taken by the Master and the exhibits introduced before him. From such review, I am convinced that the following are the material, pertinent facts:

William O. Carter, the debtor, and Margaret K. Carter are husband and wife. On March 17, 1937, Carter leased from parties named Murray, Grover and Imlay certain real property in Benton County, Washington. It is the property involved in this proceeding. The lease was for a term ending November 1, 1941. It was not acknowledged. The Pacific Coast Joint Stock Land Bank held a mortgage against the farm property in the amount of $14,500.

By the time of the filing of the petition in this proceeding, the amount of that mortgage, with interest, was $18,795. The debtor brought to the property certain farm machinery and farm stock. During 1937 Carter operated the farm himself. Early in 1938 Carter sustained severe injuries in an automobile accident and since that time complete management and control of the operation and all business in connection with the farm has been in the hands of Carter's wife Margaret. She has a separate estate secured by inheritance the amount of which is not disclosed by the record. When in 1938 Carter became disabled and transferred to his wife the position of manager of the community consisting of himself and wife, she started commingling community money with her separate money in her own bank account. The Carters remained in personal possession of the farm land until December, 1939. Then, in an effort to restore Carter's health, Mrs. Carter, with her own funds, took him to Honolulu for the winter. They placed a party in charge of the property. They found on their return on March 9, 1940, that Grover and Murray had placed Hamby in charge. Grover and Murray took the position that because the lease was unacknowledged it constituted merely a lease from year to year and was subject to cancellation on March 17, 1940. Imlay, the third owner of the property, had died in the meantime. Hamby refused the Carters' demand for possession and with threats of force prevented the Carters from obtaining possession. As a result of this situation, a number of suits were started by the various parties involved in the Superior Court of Benton County. Included among these was one for the foreclosure of the mortgage of the Pacific Coast Joint Stock Land Bank.

Sometime during this period the farm machinery and equipment and the horses, cows, sheep and other animals were removed from the farm property involved here and placed in temporary possession of other persons on the debtor's behalf. On March 16, 1939, Carter executed to his wife promissory note in the amount of $5,000, and gave her a chattel mortgage on all of the personal property here involved. It is contended by the debtors that this five thousand dollars is owed by the community to Mrs. Carter for funds she had loaned the community out of her separate estate. On May 23, 1940, Margaret Carter took a quit claim deed to the real prop-

erty from the heirs of Imlay. She gave her own promissory note in the amount of two hundred dollars and paid in cash from the bank account above-described the sum of two hundred dollars. Imlay owned an undivided one-half interest in the real property. The other undivided one-half interest belonged to Murray and Grover. Both Carter and his wife during this period in the spring of 1940 knew of the pendency and status of the mortgage foreclosure action. On July 27, 1940, debtor's petition under Section 75 of the Bankruptcy Act, 11 U.S.C.A. § 203, was filed in this Court. It was filed by William Oscar Carter alone. Neither Margaret Carter nor the community joined in the petition. Carter listed as secured claims the note of Margaret Carter in the amount of $5,000, with the mortgage on the personal property which he listed as of a value of $5,331.65. He listed the Joint Stock Land Bank mortgage saying "which mortgage is in process of foreclosure in the Superior Court of the State of Washington for Benton County which is an encumbrance against said real estate and the petitioning debtor owns an undivided one-half interest in the fee title of said real estate subject to said mortgage but the petitioning debtor is not personally obligated for the payment of said debt." He listed unsecured claims in the amount of $1,956.43. Included in these claims was one to the Baker Boyer National Bank of Walla Walla in the amount of $750, one to the First National Bank of Walla Walla in the amount of $300 and the one to Eva Pearl Imlay for the $200 promissory note given by Mrs. Carter as the balance on the purchase price for the undivided one-half interest of the real estate.

On November 18, 1940, Margaret Carter executed a quit claim deed to William O. Carter deeding to him the undivided one-half interest in the real estate and asserting that it was for the purpose of confirming title of the property as the community property of the parties. This deed was filed November 19, 1940. The testimony shows that its execution and filing was without the knowledge of William Carter.

On January 21, 1941, a petition was signed by both of the Carters asking that the original petition of William Carter be amended "so as to cover the said William O. Carter and Margaret Carter, his wife, as a marital community and with the express reservation that the same shall not cover the separate property and separate

estate of Margaret Carter." That petition has never been presented to the Court for consideration.

While the debtors' counsel argues that the debtors are entitled to possession under the terms of the lease, it must be noted that the petition and the schedules contain no reference to the lease.

The testimony of both the debtors is very unsatisfactory. Mr. Carter attempted to avoid answering questions on the ground that his wife was the one who had knowledge concerning the facts. However, there were many facts which, despite his illness, he must have known concerning which his answers were extremely evasive. Mrs. Carter's testimony was particularly unsatisfactory concerning the alleged loan of five thousand dollars by her to the community. She testified from a memorandum that she had made from her own account book. It is impossible from the book of account or from the memorandum prepared by Mrs. Carter to check on the correctness of the claim. I am in no way critical of Mrs. Carter because of this fact. We cannot expect of the farm debtors the use of satisfactory bookkeeping methods or forms. From the records and from Mrs. Carter's testimony it can be clearly deduced that the only amount for which Mrs. Carter can offer proof is $2,432.31. It is also clear that she attempts to include as a part of the five thousand dollars the notes payable to the Baker Boyer National Bank in the amount of $750 and the First National Bank in the amount of $300. Since these two items are included in the schedules as obligations of Carter and later as obligations of the community, the attempt to include them among the five thousand dollar item was clearly a duplication. It is also clear that about the same time the mortgage was executed to Mrs. Carter that Carter executed on behalf of the community to her the deed to another piece of property which also was farm property and described as the State Line property. It is also probably true that Mrs. Carter took the funds in from the operation of the farm, deposited them in her own account and then, when the money came out for expenses, she charged that against the community. I will state, however, that I can't be certain of that fact.

The record is undisputed that after the filing of the petition, without authority of the Court Mrs. Carter sold or otherwise disposed of seventy (70) lambs.

From the foregoing, I have concluded that the petition of debtors must be dismissed and these proceedings terminated. I reach this conclusion on the basis that the record discloses such a complete history of bad faith upon the part of the debtors that they are not entitled to the benefits of Section 75 of the Bankruptcy Act and its amendments. I have disregarded the technical objections which various counsel have raised. These are that the debtor is not a farmer, that no debtor-creditor relationship exists and that, at the time of the filing of the petition, the title to the undivided one-half interest in the real estate rested in the separate estate of Mrs. Carter. I think I should also state at this point that I have given full consideration to the statement made in the case of John Hancock Mutual Life Insurance Company v. Bartels, 308 U.S. 180, 181, 60 S.Ct. 221, 223, 84 L.Ed. 176, to the effect that "the only reference in Section 75 to good faith is found in subsection i, which relates solely to the confirmation of proposals for composition or extension when the court must be satisfied that the offer and its acceptance are in good faith." I cannot believe it was the intent of the Supreme Court in using that language to lend its approval to a record of positive bad faith such as is disclosed in this case. The purpose of the Act was to afford protection to unfortunate farmers who, as a result of economic circumstances, needed the benefits of a moratorium. It was never the intent of the Congress that the Act might be used as an instrumentality by which the farmer might deliberately set out to get the use of farm property for a period of three years, which property he did not own and on which property he was not farming.

The acts evidencing bad faith in this case are:

1. The acquiring of title to real estate for the nominal sum of $200 knowing that there was already in process of foreclosure a mortgage against the property in the amount of approximately $19,000. Clearly, it was never intended that the benefits of this Act would be extended to persons strangers to the title who acquire an interest in the title solely for the purpose of taking advantage of the Act.

2. The mortgaging of all of the personal property to the wife for an indebtedness which she could not prove in order that other creditors might be deprived of recourse to it.

3. The conveyance to the wife of the only piece of farm land which the community actually owned. The testimony was that the consideration for that conveyance was the assumption by the wife of the mortgage. Yet, when Mrs. Carter took the stand she declined to testify as to the amount or terms of the mortgage. Her reason for this refusal was that the mortgagee was her sister and that whatever went on between them was purely personal and nobody else's business.

4. The attempt to include in the liabilities listed the notes of the two Walla Walla banks amounting to $1,050 and, at the same time, relying upon that amount as a part of the claim of a $5,000 indebtedness to Mrs. Carter.

5. The almost defiant attitude of testifying of both Carter and Mrs. Carter.

6. The unwarranted and unauthorized disposal of property listed in the schedules by Mrs. Carter after the bankruptcy was started.

The motions of the various parties must be granted and these proceedings dismissed.