In the Matter of NORTHWEST RECREA-
TIONAL ACTIVITIES, INC., d/b/a
Chattahoochee Plantation Club, Debtor.

In re ROBMAC, INC., d/b/a Chattahoo-
chee Plantation Club, Debtor.

CHATTANOOGA FEDERAL SAVINGS
AND LOAN ASSOCIATION, Plaintiff,
v.
NORTHWEST RECREATIONAL ACTIV-
ITIES, INC., d/b/a Chattahoochee Plan-
tation Club, Robmac, Inc., d/b/a Chatta-
hoochee Plantation Club, Robert J. Butt,
and William C. Ellis, Defendants.

R. Arnold BAKER, Plaintiff,
v.
NORTHWEST RECREATIONAL ACTIV-
ITIES, INC., d/b/a Chattahoochee Plan-
tation Club; Robmac, Inc., d/b/a Chat-
tahoochee Plantation Club; Robert J.
Butt, and William C. Ellis, Defendants.

Bankruptcy Nos. 79–02976A, 79–02977A.
Adversary Nos. 79–0002A, 79–0010A.

United States Bankruptcy Court,
N. D. Georgia.

Jan. 28, 1980.

As Amended July 10, 1980.

See also Bkrtcy., 4 B.R. 33; 4 B.R. 43.

CONTENTIONS OF THE PARTIES

WILLIAM L. NORTON, Jr., Bankruptcy
Judge.

This case is before the court on a motion
of two secured creditors to dismiss the
Chapter 11 case filed by Northwest Recrea-
tional Activities, Inc. ("Northwest") d/b/a.
The Chattahoochee Plantation Club,
("Club") and/or Robmac, Inc., or, alterna-
tively, to lift the stay against lien enforce-
ment as to the Club property located in
Cobb County, Georgia.

Plaintiffs argue first that the transfer of
the Club property from Messrs. William C.
Ellis and Robert J. Butt to debtor North-
west was a fraudulent conveyance under
the law of Georgia, and as such, debtor
Northwest acquired no title to the property,

and the property, therefore, is not an asset of the estate of Northwest.

Plaintiffs argue second that debtor Northwest's Chapter 11 petition was not filed in good faith since the transfer of the Club property to the corporation, and its filing for Chapter 11 relief under the Bankruptcy Code on the same day as its corporate organization show an attempt to improperly invoke this court's jurisdiction and to abuse the purpose of the reorganization provisions of the Bankruptcy Code.

Finally, plaintiffs argue that debtor ROBMAC, Inc. has no legal cognizable right or interest in the Club property which would subject the property to the automatic stay under Chapter 11.

Debtor-defendant contends that the transfer of the Club property from Ellis and Butt to the corporation was not a fraudulent conveyance, that lack of "good faith" is not a ground for dismissal in a Chapter 11 case that there is no "cause" for dismissal under § 1112, and that because ROBMAC, Inc. is a separate entity with a legally cognizable leasehold interest in the subject property, plaintiff's request to dismiss is without merit.

### FINDING OF FACT

Northwest Recreational Activities, Inc., a Georgia corporation filed its petition seeking relief under Chapter 11 of the Bankruptcy Code on October 1, 1979. It is presently record owner of real property known as Chattahoochee Plantation Club, a recreational and club facility located in northwest Atlanta, Cobb County, Georgia. ROBMAC, Inc., another Georgia corporation which also filed a petition for relief under Chapter 11 on October 1, 1979, operates the Club under an agreement with Northwest Recreational Activities, Inc.

The Chattahoochee Plantation Club originated in 1972 when L. M. Adamson ("Adamson") and R. Arnold Baker ("Baker") obtained a loan in the amount of $1,250,000.00 from the plaintiff, Chattanooga Federal Savings and Loan Association ("Chattanooga Federal"), the proceeds from which loan were used to purchase and improve the real property on which the Club is now located.

The Club itself is located on a tract consisting of approximately thirty acres, on which is situated a clubhouse, seventeen tennis courts; a pro shop; three swimming pools and snack bar; playground areas; and horseback riding facilities.

On November 2, 1973, Baker, a plaintiff also in this proceeding, sold his interest in the Club's property to Adamson subject to the Chattanooga Federal loan, taking a $400,000.00 note and a security deed to the real property.

In April 1977, Robert J. Butt ("Butt") and Thomas R. McDonald ("McDonald") purchased the Club from Adamson, subject to the debts due to Chattanooga Federal and Baker, taking a security deed and note. Butt and McDonald also obtained a loan from the Citizens and Southern National Bank ("C&S") and gave to it a note and security deed to the property.

At or about this same time, Butt and McDonald incorporated ROBMAC, Inc. ("ROBMAC"), a Georgia corporation, the purpose for which company was to perform as the operating entity of the Club. On April 14, 1977, Butt and McDonald, as partners, entered into a written lease agreement with ROBMAC whereby they leased to ROBMAC the Club premises, as well as all the personal property located thereon and used in the Club's operations.

In the spring of 1979 defendant Ellis approached McDonald through a broker regarding purchase of McDonald's two-thirds interest in the property and in ROBMAC. Negotiations which took place during the summer resulted in the execution by Ellis of a letter of intent on August 20, 1979, following which McDonald turned over the day-to-day operation of the Club to Ellis, although the sale was not consummated until September 12, 1979.

During this time, ROBMAC, which according to McDonald has had poor financial record ever since its creation, took a turn for the worse. Although the opening of another nearby tennis resort and the general poor state of the economy may have contributed to the financial difficulties of ROBMAC, the discontinuation by C&S Bank in July, 1979 of a charge card arrangement whereby 80% of Club members

charged their dues was a serious financial blow. Debtor's cash flow was immediately reduced.

Ellis testified that on August 25, 1979, he met with an Atlanta attorney, Donald E. O'Brien ("O'Brien"), to discuss his desire to purchase McDonald's two-thirds interest in the Club. At this initial meeting, Ellis testified that he instructed O'Brien to set up a corporation to which McDonald and Butt would convey the real estate. Ellis claimed that it always had been his practice to undertake his business endeavors through corporate entities.

The last payment made to Chattanooga Federal had been made in June 1979. On August 24, 1979, Chattanooga Federal sent registered letters to Baker, Adamson, McDonald and Butt demanding that its loan be brought current. On September 7, 1979, it began running a foreclosure ad in Cobb County, Georgia, the location of the property.

McDonald having agreed to the sale of his interest in the Club to Ellis, the sale was closed on September 12, 1979. O'Brien contends he was making preparations for the incorporation of the new company, and since the incorporation had not been completed, McDonald's interests were conveyed directly to Ellis. As a result, Ellis became the owner of a two-thirds interest in the real property, as a partner with Butt, as well as the owner of two-thirds of the stock of ROBMAC, with Butt owning the remaining one-third.

On Thursday, September 27, 1979, attorney O'Brien reserved the name "Northwest Recreational Activities, Inc." On Saturday, September 29, Ellis met with O'Brien and attorneys from Swift, Currie, McGhee & Hiers to discuss the unwillingness of Chattanooga Federal to continue negotiating with Ellis and Butt. The following Monday, October 1, 1979, Northwest Recreational Activities, Inc. was chartered as a Georgia corporation at 11:56 a. m. Butt and Ellis transferred to it their respective interests in the Club property on the same day. At 4:08 that afternoon, it filed a petition for reorganization under Chapter 11 of the new Bankruptcy Code, which Code went into effect that same day. The foreclosure

sale of the property which had been advertised in September was to occur the following day, October 2, 1979.

## CONCLUSIONS OF LAW

1. *Good Faith As An Issue Under the Bankruptcy Code*

This adversary proceeding comes before the court on a complaint to dismiss the Chapter 11 petition on the basis that it was not filed in "good faith." This is an issue of first impression for this court. Under the former Bankruptcy Act, there was no question that "good faith" was necessary in the filing of a Chapter X corporate reorganization case. Section 141 of that Act stated that a Chapter X petition could be dismissed for lack of "good faith." The "good faith" of § 141 essentially involved an inquiry at the time of filing of the petition as to whether there was a prima facie possibility that a successful reorganization could be effected. Bankruptcy Act § 146(3); *In re Plaza Towers, Inc.*, 294 F.Supp. 714 (E.D. La.1967). Neither Chapter XI, Chapter XII or Chapter XIII of the Bankruptcy Act contains a similar provision requiring an inquiry as to the good faith of the debtor's petition at the time of filing for debtor relief necessitating a prima facie finding that a plan is reasonably possible. *In re Carousel Limited Partnership*, 3 Bankr.Ct. Dec. 737 (N.D.Ga.1977) (Norton, B. J.); Norton, Real Property Arrangements Under Chapter XII, Federal Bankruptcy Act, Part 14 § 14–1 (1979 Supplement). Still, aside from § 141 in Chapter X, the Bankruptcy Court under the Bankruptcy Act had the inherent power to effect a dismissal of any case for cause where a fraud or improper action of the debtor so adversely affected the creditors or put the debtor in an untenable favorable position, by for example, changing the rights of the parties respecting the property in the estate, so that the jurisdictional integrity of the court was in issue. *In re Mallard Associates*, 463 F.Supp. 1259 (S.D.N.Y.1979); *Shapiro v. Wilgus*, 287 U.S. 348, 53 S.Ct. 142, 77 L.Ed. 355 (1932); 6 Collier ¶ 6.07[1] 14th Ed.

The new Bankruptcy Code, effective October 1, 1979 (11 U.S.C.), does not speak of "good faith"; while the § 141 statement of

the good faith test has expired in the Bankruptcy Code as a specific reference to protect the creditors and the court from a debtor with only a frivolous purpose, § 1112 provides equal protection in other language. Section 1112 states that the Bankruptcy Court "may dismiss a case under this chapter, . . . for cause, . . . ." Several grounds which would constitute "cause" for dismissal are listed, including a showing at any stage of the case of debtor's inability to effectuate a plan.

Section 1112 is itself based upon the guidelines "set forth in the Bankruptcy Rules for Chapters X, XI and XII" of the Bankruptcy Act. Analysis of Bankruptcy Reform Act of 1978, *Annual Survey of Bankruptcy Law—1979* (Callaghan), 352; Bankruptcy Rules 10–308, 11–42(b), 12–41(b). Section 1112 is not inclusive of all grounds for dismissal. *Annual Survey* at 352; *H.R.Rep. No. 595, 95th Cong., 1st Sess. 406 (1977)*, U.S.Code Cong. & Admin.News 1978, p. 5963. Thus dismissal for lack of "good faith" as distinguished in the jurisdictional integrity sense, as is being pressed by the plaintiff here, is not precluded by the new Code. Good faith, in the sense perceived by this court to have continued relevance, is merged into the power of the court to protect its jurisdictional integrity from schemes of improper petitioners seeking to circumvent jurisdictional restrictions and from petitioners with demonstrable frivolous purposes absent any economic reality.

The House Report on § 1112(b) of H.R. 8200 states that:

"The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." H.R.Rep. No. 595, 95th Cong., 1st Sess. 405–06 (1977), U.S.Code Cong. & Admin.News 1978, p. 6362.

Thus, the Bankruptcy Court under the Bankruptcy Code retains the inherent power to safeguard its jurisdictional integrity as conferred by the statute over proper petitioners, and to ensure that a petitioner may not use the statutory machinery as "part and parcel of a scheme whereby the form of a judicial remedy . . . supply

. . . a protective cover for a fraudulent design." *Shapiro v. Wilgus*, 287 U.S. 348, 355, 53 S.Ct. 142, 144, 77 L.Ed. 355, (1932); See also *Tucker v. Texas American Syndicate*, 170 F.2d 939 (5th Cir. 1948). This inherent power to protect and limit the court's jurisdiction to petitioners restricted by statute is as applicable to the new Bankruptcy Code as it was to prior reorganization provisions of the Bankruptcy Act. The inclusion of "good faith" test in the jurisdictional integrity sense within the provision of § 1112 as perceived by this court, combines to ensure that the legal status and economic condition of the debtor are within the jurisdictional grant and purpose of Chapter 11.

*2. Conveyance of Ellis' Interest to the Corporation*

The State of Georgia bases its fraudulent conveyance act on the statute of Elizabeth (13 Eliz. Chap. 5). Ga.Code Ann. § 28–201 provides in part that:

"The following acts by debtors shall be fraudulent in law against creditors and others, and as to them null and void, viz:

"(2) Every conveyance of real . . estate, by writing or otherwise . . . had or made with intention to delay or defraud creditors, and such intention known to the party taking."

The question to be resolved by the trier of fact in any case involving this particular Code section is whether the action in question was done with the *intention* to delay or defraud the creditors. *Childers v. Ackerman Construction Co.*, 211 Ga. 350, 84 S.E.2d 50 (1955). "Delay" as used in said Georgia statute cannot be construed to include situations in which the debtor files a reorganization petition and obtains the protection of the automatic stay to suspend creditors from recovering possession of this collateral. The automatic stay of an otherwise proper petition is not a "delay" prohibited or contemplated by the Georgia statute. This does not mean that a petition which is without merit in substance, and filed solely for purposes of malicious delay, or otherwise improperly, is a proper one for continued jurisdiction of the Bankruptcy Court. The Bankruptcy Court provides a safe harbor for a debtor only so long as it

continues to be evident that effective rehabilitation of the enterprise is reasonably possible. It will soon become evident to the court when a debtor intends only frivolous or unwarranted delay and not effective reorganization, and the case will be dismissed pursuant to § 1112.

It is the finding of this court that no intent to wrongfully delay or to defraud creditors was present on the part of the defendants in this case. Mr. Ellis testified that it was always his intention to conduct his business affairs by means of a corporation lawfully created under the laws of Georgia. That this incorporation was not done prior to the sale to him of McDonald's interest because of the delay of his counsel in forming the corporation. Such action should not and does not condemn the transaction under review here to be fraudulent.

3. *"Good Faith"*

Plaintiffs have cited a number of cases which deal with the question of good faith in the context of a receivership or a Chapter X corporate reorganization. The court finds that these cases are, however, inapposite to the present case both because of factual differences and the different statutes being applied.

In the case of *Shapiro v. Wilgus*, 287 U.S. 345, 53 S.Ct. 142, 77 L.Ed. 355 (1932), upon which plaintiffs rely so heavily, certain creditors schemed with the debtor to place a corporation, which had been formed solely for this purpose, into a federal court receivership.

A judgment creditor complained that there was no legitimate business purpose behind such *collusion* between the *other creditors* and the *debtor* and the court dismissed the receivership. Thus, at the outset, the facts in *Shapiro* clearly are distinguishable from the facts in the present situation.

Another distinguishing factor between the *Shapiro* case and this one is that *Shapiro* was decided *prior to* the 1938 amendment' to the Bankruptcy Act (known as the Chandler Act of 1938), in which Congress for the first time made a sweeping revision of the Bankruptcy Act of 1898 so as to provide to various types of business entities statutory debtor relief short of bankruptcy liquida-

tion. Such Bankruptcy Act relief, therefore, was not available to the debtor in the *Shapiro* case. The relief under *Shapiro* was only that possible under equity jurisprudence.

Finally, the court in *Shapiro* indicated that, had the end and aim of filing the federal court receivership been to administer the assets of a corporation " . . . legitimately conceived for a normal business purpose and functioning or designed to function according to normal business methods" (278 U.S. at 355, 53 S.Ct. at 144), then the court's decision would *not* have been to dismiss such proceeding.

The facts before this court in the case sub judice demonstrate that the corporation, while hastily formed contemporaneously with the filing of this Chapter 11 petition, was created for a legitimate business purpose and that the decision to transfer the property to it was made separately and prior to the decision to file for relief under Chapter 11.

Far more importantly, however, the action taken here to form the corporation did not, as under *Shapiro*, give the debtor an improved status to protect or remove the real property security from the secured creditors. Here, the formation of the corporation, and the transfer of the title of the property to the new corporation and the filing of this Chapter 11 petition, did not give increased or changed protection to the security from the rights of the secured creditors, or alter the rights of the secured creditors, or to adversely affect the secured creditors, in any way. The owners, Ellis and Butt, could have filed a Chapter 11 petition in their individual capacities as debtors prior to the incorporation of this debtor, and thereby gained the automatic stay of the pending foreclosure action just as has been done by this corporate debtor. These plaintiff secured creditors have not been harmed, circumvented, hindered or delayed in any way that Ellis and Butt could not have accomplished without incorporation of the debtor. The means used here, therefore, to invoke jurisdiction under Chapter 11 and allow this court to administer its assets constitutes a legitimate business purpose not forbidden or restricted by the reasoning applied in the *Shapiro* case

and its progeny. *Shapiro*, p. 355, 53 S.Ct. at 144.

As regards the remainder of the cases cited by plaintiff, they are inapposite to the case sub judice. For example, the case of *In re Collins*, 75 F.2d 62 (8th Cir. 1934), involved a petition filed under § 74 of the Bankruptcy Act, which expressly denied debtor petitions for compositions and extensions to *corporations*. Because of this, the corporate debtor was powerless to protect itself from the result of its continued and repeated defaults under a deed of trust. Therefore, the Company conveyed its property to an *individual*, so that the corporation could avail itself of the statute. The Eighth Circuit held that such conveyance was, therefore, in contravention of the inherent "good faith" requirements of the Act and dismissed the petition.

In the case of *In re Fullagar*, 8 F.Supp. 603 (W.D.N.Y.1935) the district court dealt with § 75 under the former Bankruptcy Act, which section was designed for the benefit of bona fide farmers. In the *Fullagar* case, a farmer had transferred real estate to his son, a farm *laborer*, to enable him to benefit under § 75 of the Act. The court found that the son was not the "bona fide farmer" that Congress meant to benefit under the Act, and thus held that the petition was not filed in "good faith." The petitioner did not meet the statutory definition of the debtor class.

In the case of *In re Cosgrove*, 10 F.Supp. 672 (S.D.Cal.1935), an individual *not* engaged in business prior to the filing of his petition attempted to take advantage of § 74 of the prior Act, which provisions were meant to afford protection to persons engaged in business. Consequently, the court dismissed the petition because the debtor was not eligible to file a § 74 petition.

Similarly, in the case of *In re Francfair, Inc.*, 13 F.Supp. 513 (S.D.N.Y.1935), a Massachusetts trust transferred property to a corporation solely for the purposes of filing under former § 77B of the Bankruptcy Act. Since the trust itself would not have been qualified to file under such section of the Act, the court found that there was a lack of "good faith," and thus dismissed the petition.

Plaintiff cites additional cases which also dealt with situations where the debtor would not have qualified for filing under the particular section of the Act had it not transferred the property to a different entity for the purpose of filing the petition. Thus, in *In re Carter*, 38 F.Supp. 726 (E.D. Wash.1941), the petitioner was not a farmer within the meaning of § 75 of the Act, so the court dismissed the petition; in *In re Milwaukee Postal Building Corporation*, 95 F.2d 948 (8th Cir. 1938), the debtor originally was an individual, and he later formed a corporation for the sole purpose of an out-of-court reorganization, the natural and inevitable result of which, according to the court, was the filing of a § 77B petition in the Bankruptcy Court should the out-of-court reorganization be unsuccessful; in *In re North Kenmore Building Corp.*, 81 F.2d 656 (7th Cir. 1936), the corporation's petition for reorganization was held to lack "good faith" contemplated by the Bankruptcy Act where the original debtor was an individual and the corporate debtor subsequently was created for the purpose of permitting reorganization under § 77B, which could only be done by a corporation and not by an individual.

Most of these cases seem to involve situations where the only purpose of the transfer of the property to another entity was to confer jurisdiction of the court upon the new entity and thereby allow reorganization of property which otherwise could not be reorganized under the statute. Such is not the situation here.

The more recent cases cited by plaintiffs, likewise, are totally inapplicable to the case at bar. In the case of *In re Metropolitan Realty Corp.*, 433 F.2d 676 (5th Cir. 1970), *cert. denied* 401 U.S. 1008, 91 S.Ct. 1251, 28 L.Ed.2d 544 (1971), a corporation was formed *solely* as a medium by which an *individual* debtor could obtain relief under Chapter X of the prior Bankruptcy Act. Based upon the Fifth Circuit's observation that the *individual* could *not* have afforded himself of Chapter X relief, the court found a lack of "good faith" and dismissed the Chapter X petition. The court stated:

"Chapter X was enacted for the purpose of facilitating the reorganization and rehabilitation of going corporate businesses . . . It has nothing to do with the situation in which the debtor is an individual." at 679.

In the case of *Mongiello Brothers Coal Corp. v. Houghtailing Properties, Inc.*, 309 F.2d 925 (5th Cir. 1962), individuals, owing no debts except that secured by a mortgage, put their property along with a corporation which they owned into *another corporation* to be controlled by them for the *sole purpose* of utilizing Chapter X of the Bankruptcy Act. The court noted that the individual debtors did not choose to take advantage of Chapter XII, which they *could* have done. The court noted:

"that chapter [Chapter XII] has obvious disadvantages when compared to the plan now before the court." 309 F.2d at 929.

Therefore, the court held that there was a lack of "good faith" and dismissed the Chapter X petition.

"In considering the presence or absence of good faith, it must be borne in mind that the Act is not to be abused by the extension of its privileges to those not within the contemplation of it, such as where individual debtors convey their property to a corporation for the purpose of utilizing Chapter X proceedings." at 930.

The major concern of the courts in most of the cases above mentioned is that the reorganization court is available only to those entities for which Congress intended in that particular chapter. The case *sub judice* comes before the court under a different statutory framework than the cases cited above. Under Chapter 11 of the new Bankruptcy Code, an individual or a corporation or other entity may file for relief. Sections 301 and 109(d); Brody and Weingarten, Reorganization, in Practicing Under the Bankruptcy Reform Act, 193 (CRR Publishing Co. 1979). The debtor class is broad.

The known fear of personal involvement and the desire of individuals to protect personal assets from jurisdiction in a bankruptcy case is so great that the organization of a new entity by a partnership or individuals incident to the transfer of partnership or individual property to such new entity and the filing of a Chapter 11 petition, as here, is highly suspect as to jurisdiction over said entity and assets. The Bankruptcy Court will thoroughly review the facts of such pre-bankruptcy actions to determine whether the rights of creditors to exercise collection rights have been altered or offended adversely. The circumstances should receive the closest scrutiny of the Bankruptcy Court relative its jurisdiction over said fresh entity in order to determine whether jurisdiction has been improperly conferred by fraudulent acts of the debtor against the interests of creditors. *Shapiro, supra.*

Yet, the test is not merely whether a transfer of property and a change of entity occurred on the eve of the petition for relief under Chapter 11. Such a test would void all such actions occurring on the eve of filing. It would present an issue involving all pre-petition actions, (i.e.: the issue being when are such actions beyond the period of the eve of bankruptcy; how far does the period of eve of bankruptcy extend to prior transfers? The timeliness of the change of entity and/or transfer of property is not controlling. The test suggested in *Shapiro* and its progeny seems to be whether any of the substantive or procedural rights of any of the creditors to assets, available prior to the transfer of the property, have been altered or eroded by the transfer and subsequent Chapter 11 filing.

It is the detriment to the creditors, not the advantage to the prior partnership and partners, which this court deems more relevant to the issue of whether the creditors are fraudulently hindered or delayed by the Chapter 11 filing. Here, the entry of the new investor and the organization of the corporation and simultaneous transfer of the secured creditors' security to the corporation, and the assumption of all prior debts by the new entity, provided to the creditors restrained by this Chapter 11 case the same real property security as had protected such creditors prior to the transfer. No property or personal liability has been removed from or made less available to any creditor. Here, there are three mortgages on the country club real property and no known wage or trade or other unsecured

creditors. The evidence is that the value of the real property slightly exceeds the amount of the debt of the lien creditors.

The new corporate entity additionally offers the creditors the alleged advantages of the managerial experience of the new individual investor-manager, and the potential of greater financial resources through this new individual investor than existed prior to the transfer and creation of the new entity. Despite the delinquency in monthly payments on the first and second mortgages that triggered the foreclosure action which was pending at the time of filing, the Debtor now has alleged financial resources sufficient to comply, and is complying, with this court's prior order of adequate protection which requires the timely payment of the contract mortgage amounts as they become due after date of filing of the complaint for adequate protection.

■ In conclusion, the corporate debtor has submitted assets and financial resources to the jurisdiction of this Court, for administration of the claims of its creditors no less than, perhaps more than, that available for such claimants from the security of the property and liability of the partnership and partners prior to the transfer and organization of the debtor corporation and the filing of this Chapter 11 petition. Thus, there has been no fraud upon creditors and no creditor has not been wrongly hindered or delayed in the potential collection of a claim. The delay which has occurred by this filing resulting from the stay is procedural, not substantive, and the authority to file, stay and delay (i.e. Chapter 11 relief) was available to the partnership prior to the organization of this petitioning debtor.

4. *ROBMAC, Inc.—Property of the estate:*

Plaintiffs contend that ROBMAC's interest in its lease of the club property is not "property" as that term is used in § 541 of the Bankruptcy Code. The court must reject this interpretation of § 541.

The Bankruptcy Code provides that "all legal or equitable interests of the debtor in property" constitute property of the estate. (§ 541).

"This provision, broader than that under prior law, is designed to include as property of the estate all interests of the debtor in property of any type, tangible or intangible, contingent or fixed." Analysis of Bankruptcy Reform Act of 1978, *Annual Survey of Bankruptcy Law —1979* (Callaghan), 301. See also *Collier on Bankruptcy*, ¶ 541.07(1) (15th Ed.). The legislative history of the Code also indicates that leasehold interests constitute "property."

"This section defines property of the estate, and specifies what property becomes property of the estate. . . . Under paragraph (1) of subsection (a), the estate is comprised of all legal or equitable interest of the debtor in property, wherever located, as of the commencement of the case. The scope of this paragraph is broad. It includes all kinds of property, . . . The debtor's interest in property also includes 'title' to property, which is an interest, just as are a possessory interest, or *leasehold interest,* for example." [Emphasis supplied]. H.R.Rep. No. 95–595, 95th Cong., 1st Sess., p. 367 (1977), U.S.Code Cong. & Admin.News 1978, p. 6323. See also *Collier* ¶ 541.07(4) (15th Ed.).

■ There can be no question that the leasehold interest of ROBMAC, Inc. in the Club property is within the scope of § 541 property.

Judgment under Bankruptcy Rule 921 consistent with these findings will be entered simultaneously with this opinion.