**In re TOLCO PROPERTIES, INC., a Virginia Corporation, Debtor.**

**Bankruptcy No. 80–00805.**

United States Bankruptcy Court,
E. D. Virginia,
Richmond Division.

Sept. 16, 1980.

See also, Bkrtcy., 6 B.R. 490.

Robert E. Eicher, Richmond, Va., for North Carolina Mutual Life Ins. Co.

William D. Bayliss, and Paul S. Bliley, Jr., Richmond, Va., for Tolco Properties, Inc.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter comes on upon the filing by North Carolina Mutual Life Insurance Company (NCM), Plaintiff herein, of a Motion to Dismiss under Chapter 11 of the Bankruptcy Code pursuant to § 1112 thereof. Plaintiff's Motion was filed on June 6, 1980, the same day that the Debtor, Tolco Properties, Inc., (Tolco) filed a Voluntary Petition in Bankruptcy under 11 U.S.C. Chapter 11. On June 23, 1980 NCM filed its Brief in support of its Motion to Dismiss and a response to the Motion to Dismiss was filed by the Debtor on July 3, 1980, with a Brief in support thereof. Upon notice to all parties a hearing was had in the matter on August 8, 1980. Upon the foregoing the Court renders the following opinion.

## STATEMENT OF THE FACTS

Tolco Properties, Inc., the Debtor and Defendant herein is a Virginia corporation which has as its only asset property known as Triangle Shopping Center (Property). Mr. R.W. Tolleson is the President of Tolco. North Carolina Mutual Life Insurance Company (NCM) is the holder of a promissory note made by Tolco payable to NCM in the amount of $625,000 plus interest, dated June 13, 1975. This note is secured by a first deed of trust covering the Property in Louisa County, Virginia. In 1977 the Property was conveyed by Tolco to Mr. and Mrs. R.W. Tolleson and remained in the names of Mr. and Mrs. Tolleson until just prior to the filing of the Petition herein by Tolco in June of 1980 at which time Mr. and Mrs. Tolleson reconveyed the Property to Tolco.

Reviewing the loan payment history of Tolco as to NCM's loan, the evidence indicated that Tolco defaulted on its note in 1976 and NCM exercised its right to receive rents at that time. The default was subsequently cured and the loan was reinstated. In 1978 Tolco again defaulted and foreclosure proceedings were instituted by NCM. These proceedings were enjoined by an injunction granted in Louisa County, Virginia. The default was again cured and the loan reinstated. In 1979 a third default occurred and foreclosure proceedings were again instituted. A second injunction to stay the foreclosure was entered in Louisa County based on the anticipation of a refinancing of the loan. This refinancing did not materialize and upon expiration of the injunction the foreclosure proceedings were resumed. On May 21, 1979 Tolco filed in this Court a Chapter XI proceeding under the Bankruptcy Act of 1898, as amended.[1]

---

1. From the evidence herein it appears that the fee title to the shopping center was not vested in Tolco at that time. Whether the Petition in Chapter XI stayed any foreclosure action of NCM against real estate no longer owned by the Debtor was not determined by this Court at that proceeding.

Upon motion of the Debtor the Chapter XI petition was dismissed on May 30, 1979. A further default was caused by Tolco in December of 1979 whereupon NCM exercised its right to receive rents directly to NCM. Foreclosure proceedings were once more commenced and again stayed by the current Chapter 11 petition before this Court being filed on June 6, 1980.

The Property, commonly known as Triangle Plaza Shopping Center consists of approximately 7.44 acres of land with improvements thereon situated to the south of Virginia State Route 22 and located in Louisa County, Virginia. In February of 1979 an appraisal of the Property was made for Mr. R.W. Tolleson by Mr. Joseph B. Call III (Debtor's Exhibit No. 1). The appraisal, based on the income approach (which the appraiser believed was the most indicative of current fair market value), indicated that the fair market value of the Property was $875,000. An updated appraisal in February of 1980, again using the income approach, gave a fair market value of the Property at $900,000 (Debtor's Exhibit No. 2). In both appraisals the appraiser used "economic rents" as the basis for determining the annual rental value of the Property. It was shown that these rental values were somewhat higher than the actual rental values currently in effect. Specifically the appraisal shows an estimated market rental value for the area occupied by the A & P Store to be $55,782 per year while the actual rent, based on the rental agreement with the Great Atlantic & Pacific Tea Company (A & P) is $47,100 annually. Further, the evidence indicated that while both the parking lot and the sewage disposal system were in a state of disrepair at the time of the updated appraisal of February 1980, that appraisal did not take into consideration these conditions and presumed that these conditions had been rectified.

The evidence revealed that the parking lot of the Property remains in a current state of disrepair. The lot was paved in the year 1974–75 and there is a current outstanding bill of $2,500 due and payable to Barton & Boyd for that paving work. Mr. Tolleson testified that when this outstanding bill is paid, Barton & Boyd has agreed to rehabilitate the parking lot at a proposed figure of $12,000. NCM presented evidence by way of a proposal submitted by Barton & Boyd to A & P and sent to Mr. Tolleson in a letter to him from A & P indicating that it would cost approximately $33,527 to repave the parking lot (Plaintiff's Exhibit No. 3).

The evidence indicated that the sewage disposal system is in a defective condition and remains a problem as of this date. Mr. Tolleson testified that it was initially believed that it would cost between $30,000 and $40,000 to repair the system. However, subsequent information received by Mr. Tolleson indicated that the sewage disposal system could be repaired for a cost of between $10,000 and $15,000. Evidence was brought out that there is currently litigation in the state court over the sewage disposal system and the possible enjoining of the use of the sewage system due to its defective condition. Such an enjoining of the sewage disposal system would necessarily force a termination of the activities of the tenants and a cessation of rental income.

Mr. Tolleson testified that the County of Louisa real estate assessment was over $1,000,000. The appraisal of Mr. Call indicated that the 1979 County of Louisa real estate assessment was $1,021,700. The only offer Tolleson has received since fall of 1979 when the Property was listed with a real estate agent, was for $775,000 from CRT, Inc., a competitor. This offer was refused by Mr. Tolleson and no other offers have been made.

The Property is encumbered by the following deeds of trust and/or liens:

(1) First deed of trust in favor of NCM in the approximate amount of $614,000 to pay off the loan as of August 1980.

(2) Second deed of trust in favor of Emerson Spies, noteholder, in the approximate amount of $54,000, due and payable September of 1980.

(3) Third deed of trust in favor of Kenneth P. Gross with current amount due of approximately $30,000 now due and payable to Maurice Gaffney, noteholder.

(4) Fourth deed of trust in favor of First & Merchants National Bank with an estimated amount of principal and interest due of $45,000, due and payable September 1980.

(5) United States tax lien in the amount of $23,794.88, docketed May 8, 1980.

(6) Unpaid real estate taxes for the Town of Louisa and the County of Louisa in the amount of $12,950.41 for the year 1979.

According to the testimony of Mr. Tolleson the 1979 unpaid real estate taxes for the Town of Louisa and the County of Louisa are in dispute. Although all taxes over the amount of $3,300 are by lease agreement payable by the tenants of the Property, this presupposes full occupancy and payment by tenants of their pro-rata portion.

With the exception of the first deed of trust to NCM and the second deed of trust to Emerson Spies, all the above liens are personal obligations of R.W. Tolleson and wife and are not obligations of Tolco; however, they are liens against the real estate owned by the Debtor.

Mr. Tolleson testified that Tolco is now in the process of negotiating a $220,000 "wraparound" deed of trust. There will be a $25,000 fee for this loan if it is approved, leaving an available balance of $195,000 to apply to the outstanding deeds of trust and liens. Mr. Tolleson indicated that Tolco would use this money to reinstate the deed of trust to NCM; to pay off the deed of trust in favor of Emerson Spies; to pay off the deed of trust in favor of First & Merchants; to pay for the repaving of the parking lot; to repair the sewage disposal system; to pay for general landscaping of the area; to pay off the county taxes and

possibly the town taxes. Mr. Tolleson indicated that it will not be used to pay off the third deed of trust in favor of Mr. Gaffney as this is currently being paid off through other sources. Mr. Tolleson was not sure if this money would be used to pay off the U.S. tax lien, however, before the second "wraparound" deed of trust could enjoy a second position behind the deed of trust of NCM, all inferior liens would have to be released, that being a requirement of the "wraparound" deed of trust.

It was established that the annual fixed rent based on leases currently in effect generate approximately $90,000, not including the fees charged to tenants for maintenance and sewage and water. Based on 1979 figures, tenants of the Property remitted to Tolco $1,153 for their required maintenance fee and further remitted $2,686 for water and sewage cost. All but one of the leases have overage percentage rent, although A & P was the only tenant that generated sufficient income to create an overage rent of $728 in 1979.

As to Tolco's expenses in regard to the Property, it was established that the yearly debt service currently to NCM, based on $5,754 a month is $69,048 per year. If the second "wraparound" deed of trust is consummated, the yearly debt service based on a monthly figure of $7,150 would equal $85,800 per year.

Mr. Tolleson testified that he has been in contact with two other national chains who desire to lease the space at a monthly rental value of $6,000 per month which A & P now rents at $4,000 per month. It must be noted, however, that A & P currently has a rental lease agreement effective through 1993 without any right to a rental increase.

With the exception of the assignment of rent instituted twice by NCM, Tolleson and Company has always collected the rent, paid the bills, and generally managed the Property at no cost to Tolco.

According to the testimony of Tom Matthews, Vice President of the Bank of Virginia Mortgage Corporation, the mortgage corporation has received the rent from Tol-

co Properties since January 1980. He presented into evidence a "STATEMENT OF BVA LOAN NO. 61234 TOLCO PROPERTIES, INC. AS OF 8/7/80." (Plaintiff's Exhibit No. 1) which showed an arrearage in payments in 1979 of $17,923.89; and arrearage from January 1, 1980 to August 7, 1980 of $58,738.04; and an amount required to bring the loan current as of 8/7/80 of $48,056.23; and an amount required to pay off the loan as of that same date of $614,008.07.

### CONCLUSIONS OF LAW

Plaintiff's Motion to Dismiss is based upon 11 U.S.C. § 1112, which pertinent parts are as follows:

"(b) ... on request of a party in interest, and after notice and a hearing, the court may convert a case under this chapter to a case under Chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, *for cause,* including—

(1) continuing loss to *or* diminution of the estate *and* absence of a *reasonable* likelihood of rehabilitation; ..." (Emphasis added)

■ From the legislative history regarding said subsection (b) and 5 *Collier on Bankruptcy* ¶ 1112.03[2][c] (15th ed. 1979), it is clear that dismissal or conversion is not limited to the circumstances described in paragraph 1 through 9 of § 1112(b). Plaintiff in its Brief first argues that the conveyance from Mr. and Mrs. Tolleson to Tolco was not in "good faith" and, therefore, is proper "cause" under 11 U.S.C. § 1112 to mandate a dismissal or conversion of this case. While the new Bankruptcy Code does not speak of "good faith", case law has held that the lack of "good faith" would constitute "cause" for dismissal under § 1112 of the Bankruptcy Code (11 U.S.C.).

"Thus dismissal for lack of 'good faith' as distinguished in the jurisdictional integrity sense, as is being pressed by the plaintiff here, is not precluded by the new Code. Good faith, in the sense perceived by this court to have continued relevance, is merged into the power of the court to protect its jurisdictional integrity from schemes of improper petitioners seeking to circumvent jurisdictional restrictions and from petitioners with demonstrable frivolous purposes absent any economic reality." *In the Matter of Northwest Recreational Activities, Inc., d/b/a Chattahoochee Plantation Club,* 4 B.R. 36, 39, 6 B.C.D. 164, 166 (Bkrtcy.N.D.Ga.1980)

In *Northwest Recreational Activities, Inc., supra,* Robert J. Butt and Mr. Ellis formed the corporation Northwest Recreational Activities, Inc., transferred their respective interests in a club that they were managing, and then filed a petition for reorganization under Chapter 11 that same day. A foreclosure sale of the property of the club was to occur the following day and was stayed by the petition in bankruptcy. That court found that the new corporation was created for a legitimate business purpose and not to wrongfully delay or defraud creditors.

"Far more importantly [to the issue of good faith], however, the action taken here to form the corporation did not ... give the debtor an improved status to protect or remove the real property security from the secured creditors. Here, the formation of the corporation, and the transfer of the title of the property to the new corporation and the filing of this Chapter 11 petition, did not give increase or changed protection to the security from the rights of the secured creditors, or to adversely affect the secured creditors, in any way. The owners, Ellis and Butt, could have filed a Chapter 11 petition in their individual capacities as debtors prior to the incorporation of this debtor, and thereby gain the automatic stay of the pending foreclosure action just as has been done by this corporate debtor. These plaintiff—secured creditors have not been harmed, circumvented, hindered or delayed in any way that Ellis and Butt could not have accomplished without incorporation of debtors." *Northwest Recreational Activities, Inc., supra* 4 B.R. at p. 41, 6 B.C.D. at p. 167.

■ As in the *Northwest* case, *supra*, the Tollesons could have elected to file a petition in bankruptcy under Chapter 11. *See* 11 U.S.C. § 109(d) and § 101(30). Since no evidence was presented at trial to substantiate a lack of "good faith" or to show prejudice to the secured creditors other than the actual transfer, it is the finding of this Court that there was no lack of "good faith" in the transfer of the Property from the Tollesons to Tolco Properties, Inc.

■ As to the statutory grounds which warrant dismissal or conversion of the case, § 1112(b)(1) requires that this Court find "cause" or both "continuing loss to or diminution of the estate" and "absence of a reasonable likelihood of rehabilitation". This Court finds unpersuasive the argument of the Defendant that the concept of "continuing loss to or diminution of the estate" is analogous to "adequate protection" of § 362(a) of the Bankruptcy Code. It seems clear to this Court that "continuing loss to or diminution of the estate" implies more than "adequate protection" of the Plaintiff.

In regard to "continuing loss to or diminution of the estate", the following guidelines have been suggested:

> "Obviously, if the debtor has a negative cash flow after entry of the order for relief in the chapter 11 case, the first of the two elements of section 1112(b)(1) is satisfied. Section 1112(b)(1) does not, however, specify that only cash losses are to be considered. Although the debtor may have a positive cash flow, the court should consider whether the debtor is suffering a loss by reason of actual depreciation in the value of property of the estate. The continuing loss or diminution standard set forth in section 1112(b)(1) requires the court to consider depreciation of assets in the economic, rather than accounting sense. A debtor which is operating at a loss according to generally accepted accounting principles may not fall within the 'continuing loss' or 'diminution of the estate' standards if it can

be established that the value of the debtor's assets is appreciating rather than depreciating." 5 *Collier on Bankruptcy* ¶ 1112.03[2][c][i] (15th ed. 1979).

For the purposes of this opinion a Summary of Income and Expenses Chart will be incorporated and is attached as Appendix A.

Reviewing Tolco Properties cash flow as indicated by Chart No. III in the Summary of Income and Expenses (*See* Appendix A), it appears that Tolco does have a positive cash flow of approximately $9,000 per year. This statement, however, must be qualified by considering the need for the capital expenditures in the amount of at least $26,500 as indicated in Chart IV.[2] If these capital expenditures were amortized over a ten—year period, it would cause a reduction in the yearly net income of approximately $2,500 creating a yearly net income of $6,500 per year. That net income figure must be further tempered by the fact that Tolleson & Co., which collects the rents and manages the Property, required no fee for their services, and by the fact that there is no contingency fund to buffer any unforeseen expenses in a given year. In light of all these facts and using Tolco's estimate of cost of capital expenditures, it cannot be said that Tolco does not have a positive cash flow, although there appears no margin for unexpected expenses or diminution in rents. NCM's estimate of cost for repairs would substantially increase the need for funds necessary to amortize capital expenditures to the extent that would result in an obvious and certain negative cash flow.

A second consideration of the "continuing loss to or diminution of the estate" concept concerns whether there exist actual depreciation in the value of the property of the estate. A review of the appraisals of Mr. Joseph B. Call III of February 1979 and February 1980, indicates an apparent appreciation in the value of the Property of $25,000. As noted above, the second appraisal takes no consideration of the disrepair of

---

2. NCM's estimate of the capital expenditure would approximate $48,027 because of its high-er estimate for repairs to the parking lot.

the parking lot or the defective condition of the sewage system, which will cost at least $26,500 when using the lowest estimates offered by the Debtor. Conversely when using NCM figures, this cost would approximate $48,027. These required capital expenses negate the apparent appreciation of the Property reflected in the appraisal. Accordingly, even using the Debtor's figures there is an actual depreciation in the value of the Property, which this Court considers a "continuing loss to or diminution of the estate".

■ Depreciation of the Property, however, is not a sufficient ground for dismissal or conversion in and of itself. The requirement of an "absence of a reasonable likelihood of rehabilitation" must also be proved.

"Under the standard contained in section 1112(b)(1), losses alone are not grounds for conversion. In order for the court to dismiss or convert under paragraph (1) the debtor's financial condition must be such as to permit the court to determine that there is no reasonable likelihood that the debtor will be rehabilitated. 'Rehabilitate' has been defined to mean 'to put back in good condition; re–establish on a firm, sound basis.' Rehabilitation, as used in section 1112(b)(1) does not mean the same thing as reorganization, as such term is used in chapter 11. Since a debtor can be liquidated in chapter 11, the ability to confirm of [sic] plan of reorganization is considerably different than reaching a firm, sound financial base." 5 *Collier on Bankruptcy* ¶ 1112.03[2][c][i] (15th ed. 1979) (Footnotes omitted).

As stated in *Collier, supra*, rehabilitation encompasses more than a mere liquidation under Chapter 11 although it is undisputed that such a liquidation plan under Chapter 11 is permissible [11 U.S.C. §§ 1123(b)(4) and 1123(a)(5)(D)].

As indicated by Chart VI (*See* Appendix A), a required expenditure of $236,781.52 will be needed. Tolco has suggested the possibility of a $220,000 "wraparound" second deed of trust in order to accomplish this purpose. However, once there is deducted the $25,000 required loan fee, only $195,000 remains to apply to the required expenditures. As can be seen from Chart VI this money will be insufficient to pay off the existing encumbrances on the Property. Assuming that this $220,000 "wraparound" deed of trust would be sufficient to cover the outstanding encumbrances on the Property, the evidence indicated that the debt service on this "wraparound" deed of trust would amount to $16,752 per year. As shown by Chart III, the yearly net income derived from the Property could not support such a second deed of trust "wraparound". It would consequently follow that to pay off the liens inferior to NCM's lien would require a greater loan and hence a greater debt service. Any alternative solution would require a refinancing of the entire project.

■ Although the Debtor may have other ideas relative to a rehabilitation of this Property, it is not appropriate that it be given choices *ad infinitum* to the continual delay and detriment of others. The history of this project for four years has resulted in frustration to the primary secured creditor. The Court should give consideration to the prior conduct of the Debtor in reaching a determination of whether to allow the Chapter 11 proceeding to continue or to dismiss or convert under § 1112(b). In addition NCM has met its burden of proof under § 1112(b)(1). This Court cannot conclude that NCM should be required to wait for further attempts to rehabilitate the Debtor.

■ NCM having met its burden of proof under § 1112(b), it is now incumbent upon this Court to decide either to grant Plaintiff's Motion to Dismiss or convert this case to a case under Chapter 7. As reflected by the legislative history, the court has "wide discretion" in making its determination.

"Subsection (b) gives wide discretion to the court to make an appropriate disposition of the case when a party in interest requests. The court is permitted to convert a reorganization case to a liquidation case or to dismiss the case, whichever is in the best interest of creditors and the estate, only for cause."

House Report No. 95–595, 95th Cong., 1st Sess. (1977) 405, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6361.

 In its Brief in Argument Tolco has argued that a conversion to a Chapter 7 is in its best interest and that its ultimate purpose is to effect a liquidation of its sole asset. Although dismissal may be of best interest to NCM, this Court must consider the best interest of all creditors. It is the Court's opinion that an orderly liquidation under Chapter 7 would provide an opportunity for a negotiated sale at a better price than would be obtainable at foreclosure under NCM's deed of trust and would allow for an orderly distribution of proceeds in this proceeding. Although foreclosure by NCM after a dismissal of this proceeding, would probably occur more rapidly than a sale after conversion to a Chapter 7 proceeding, the likelihood of a greater remuneration inures to the benefit of creditors in addition to NCM. For these reasons and there being no prohibition against conversion under § 1112(c), this Court finds it to be in the best interest of creditors and the estate to convert this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code (11 U.S.C.).

## APPENDIX A

### SUMMARY OF INCOME & EXPENSES

#### I. ANNUAL INCOME

| | |
|---|---:|
| Annual fixed rent (based on leases currently in effect) | $ 88,264.00 |
| Maintenance fee (based on 1979 figures) | 1,153.00 |
| Sewage & water fee (based on 1979 figures) | 2,686.00 |
| Overage % rent per contracts (A & P only in 1979) | 728.00 |
| **TOTAL INCOME** | **$ 92,831.00** |

#### II. ANNUAL EXPENSES

| | |
|---|---:|
| Debt service to NCM | $ 69,048.00 |
| Poore family (sewage and water fee) | 3,000.00 |
| Taxes (Town & County, omitting those amounts which tenants are required to pay) | 3,300.00 |
| Maintenance fee | 1,800.00 |
| VEPCO lighting (based on average monthly billing) | 6,300.00 |
| Accounting fees (preparation of tax return) | 200.00 |
| TOLLESON & CO. (collection of rents and management fees) | –0– |
| Contingency Fund | –0– |
| **TOTAL EXPENSES** | **$ 83,648.00** |

#### III.

| | |
|---|---:|
| Total income per year | $92,831.00 |
| Total expenses per year | 83,648.00 |
| **NET INCOME** | **$ 9,183.00** |

#### IV. REQUIRED CAPITAL EXPENSES NOT REFLECTED IN ANNUAL EXPENSES (Debtor's Estimate)

| | |
|---|---:|
| Pay off for past work for paving lot | $ 2,500.00 |
| Repaving lot | 12,000.00 |
| Sewage Repair | 12,000.00 |
| | $ 26,500.00 |

#### V.

| | |
|---|---:|
| Income over expenses per year | $ 9,183.00 |
| Debt service on anticipated $220,000 "wraparound second deed of trust" | 16,752.00 |
| Yearly Income Deficiency | $ 7,569.00 |

#### VI. REQUIRED EXPENDITURES TO REHABILITATE TOLCO'S PROPERTY

| | |
|---|---:|
| Amount required to bring NCM loan to current status as of 8/7/80 per Plaintiff's Exh. 1 [1] | $ 48,056.23 |
| Less rents due but not yet remitted and arrearage rent from Kick's Amusement Center [2] | – 3,520.00 |
| | $ 44,536.23 |

---

[1] This total fails to reflect payment due but not yet receiʳ for August rent from the Property's tenants.

[2] Rents due NCM for August rent from Family Dollar Store, $750; Emerald Acre Florist, $270; Western Auto, $850; Thompson Oil, $150; and the Virginia ABC Store, $450 plus arrearage rent from Kick's Amusement Center for May, June and July totalling $1,050.

| | |
|---|---|
| 2nd deed of trust payoff to Dean Spies ...................... | 54,000.00 |
| 3rd deed of trust payoff to Maurice Gaffney ................... | 30,000.00 |
| 4th deed of trust payoff to First & Merchants .................. | 45,000.00 |
| U.S. tax lien ................... | 23,794.88 |
| Cost to repave parking lot, pay past due bill .................... | 14,500.00 |
| Cost to repair sewage system ..... | 12,000.00 |
| 1979 unpaid Town & County of Louisa real estate taxes ........ | 12,950.41 |
| | $236,781.52 |