In re Harry Charles PAPPAS, Debtor.

PACCAR FINANCIAL CORP., Plaintiff,

v.

Harry Charles PAPPAS, Defendant.

United States Bankruptcy Court, D. Massachusetts.

Feb. 12, 1982.

---

James F. Queenan, Jr., Bowditch & Dewey, Worcester, Mass., for plaintiff.

Steven A. Kressler, Kressler, Kressler & Pitnof, P.C., Worcester, Mass., for defendant.

## MEMORANDUM AND ORDER

PAUL W. GLENNON, Bankruptcy Judge.

Before the Court in the above-captioned proceeding is a motion to convert the case from a case under Chapter 11 of the Bankruptcy Code (11 U.S.C. §§ 101, et seq., as amended by the Bankruptcy Reform Act of 1978, P.L. 95–598) to a case under Chapter 7 filed by Paccar Financial Corp. ("Paccar"),[1] a creditor. Also before the Court is a complaint filed by Paccar to modify the automatic stay pursuant to 11 U.S.C. § 362 to permit it to exercise its right of foreclosure under applicable state law with respect to

---

**1.** The debtor-defendant was a distributor of trucks. Paccar Inc. is the parent corporation of Paccar Financial Corp., the creditor-plaintiff. Peterbilt Motors is an unincorporated division of Paccar Inc. which built Peterbilt trucks sold by Pappas. Paccar Financial Corp. provided both floor-plan financing of the debtor's inventory of trucks and retail financing of his sales to his customers.

either a mortgage it holds on certain real estate of the debtor in Manchester, New Hampshire or with respect to an attachment lien on this same Manchester real estate.

The debtor originally filed his petition under Chapter 13 of the Bankruptcy Code. The Chapter 13 petition was filed on July 22, 1980. Paccar filed a complaint to modify stay with respect to the Manchester property on November 14, 1980. The Chapter 13 case was dismissed on March 17, 1981 because the debtor's noncontingent, liquidated, secured debts exceeded $350,000 and thus under 11 U.S.C. 109(e) the petitioner was not eligible to be a debtor under Chapter 13.

On March 18, 1981 the debtor filed this petition under Chapter 11. Paccar again filed the complaint to modify stay and also filed the motion to convert the case to a case under Chapter 7. Paccar is both a secured and an unsecured creditor in this proceeding. It is a secured creditor by virtue of its status as the holder, by a February 24, 1981 assignment, of a mortgage in the original principal amount of $175,000 given by the debtor to the Amoskeag Savings Bank. The property covered by this mortgage is the real estate at 143 Frontage Road, Manchester, New Hampshire. This property was used by Peterbilt of New Hampshire, Inc., a corporation controlled by the debtor, which operated the Peterbilt franchise in New Hampshire. Paccar is also the holder of a judgment[2] against the debtor entered in May of 1979 in the principal amount of $247,508 plus six percent interest from May of 1979. This judgment is secured by a $300,000 attachment on all the debtor's real estate. This attachment, according to a Stipulation filed with the Court as to the state of record title for four properties owned of record by the debtor, is junior to the first mortgage held by Paccar and is also junior to two other attachments.[3]

Paccar also claims to be an unsecured creditor in this case, although not so listed on the debtor's schedules, by virtue of the debtor's personal guarantee of retail financing granted by Paccar to the customers of Peterbilt of New Hampshire, Inc. Ronald H. Russo, Northeast Area Manager for Paccar Financial Corp., testified that the amount due Paccar as of April 30, 1981 under this guarantee was $481,698.32, plus "some other losses", less a credit for the reserve account of $283,808.61, and that the net amount due was not secured.[4]

Counsel agreed to consolidate the motion to convert and the complaint for relief from stay for hearing. This hearing was conducted over five days during the summer of 1981: June 15, June 29, July 20, August 10, and August 12.

## I. MOTION TO CONVERT TO CHAPTER 7

Paccar asserts three statutory grounds, 11 U.S.C. § 1112(b)(1)–(3), as the basis for its motion to convert this case to a case under Chapter 7: (1) continuing loss to or diminution of the estate, and the absence of a reasonable likelihood of rehabilitation; (2) the debtor's inability to effectuate a plan; and (3) unreasonable delay by the debtor that is prejudicial to creditors. In addition, Paccar contends that continuing bad faith has been demonstrated by the debtor in this proceeding and in his prior Chapter 13 proceeding and is sufficient cause in itself to grant the motion to convert to Chapter 7.

---

**2.** This judgment resulted from five insufficient fund checks made out to Paccar for five trucks sold out of trust by the debtor.

**3.** A blanket mortgage to John A. Sykas, the debtor's cousin, on all the debtor's real estate in the amount of $900,000 recorded on February 16, 1978, was set aside by the United States District Court for the District of New Hampshire as a fraudulent conveyance.

**4.** The debtor appears to have overlapped Paccar's unsecured claim arising out of the debtor's personal guarantee with Paccar's secured claim as purchaser of the first mortgage. Schedule A–2 describes as consideration for the mortgage held by Paccar: "First mortgage assigned by Amoskeag Savings Bank, 2–25–81, contingent, unliquidated, disputed monies due under a guarantee." The amount of the claim is listed as $308,127.00.

(A) Continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation.

■ The assets of the debtor consist almost entirely of real estate.[5] Schedule B–1 of the debtor's schedule of assets and liabilities lists three properties as constituting the real property of the debtor on the date of the filing of the Chapter 11 petition. The first property is the Manchester property which the debtor lists as having a market value of $750,000. This property was listed at $400,000 in the debtor's Chapter 13 schedules. The real estate appraisal submitted by Paccar through John M. Crafts of Crafts Appraisal Associates concluded that the fair market value of the Manchester property as of June 13, 1980 was $350,000. Mr. Crafts testified that the value of the property, in his opinion, had appreciated to $395,000 as of July 20, 1981. Robert G. Bramley, an appraiser previously retained by Paccar but called by the debtor, concurred in this opinion and I so find.

The second property scheduled by the debtor is located on California Street in West Swanzey, New Hampshire ("the California Street property"). The debtor reported the market value of this property to be $250,000 in his Chapter 11 schedules and $100,000 in his Chapter 13 schedules. No other evidence having been presented to the Court as to the value of this property, the Court concludes only that the market value lies somewhere in the $100,000 to $250,000 range.

The third property is located on Route 12 in Swanzey ("the Butler building") and its market value is listed at $40,000 in both the Chapter 13 and Chapter 11 schedules.

A fourth property, the debtor's home in Swanzey Lake, New Hampshire, was not listed on the Chapter 11 schedules but did appear in the Chapter 13 schedules at a market value of $90,000.

Each of these properties is heavily encumbered. Paccar has an attachment in the amount of $300,000 on each of the four properties, securing a judgment in the principal amount of $247,508 plus six percent interest from May 1979. As of June 1981 $260,853.09 was owed on the judgment. Attachments by Messers. Bickford and Roberts are also on record.[6] Thermo King Corp. has a $90,000 attachment on all the debtor's real estate with the exception of the Manchester property. Thus, after satisfaction of mortgages and taxes, any remaining value in the debtor's real estate is to be applied toward the satisfaction of liens in the amount of $390,000, excluding the Bickford and Roberts attachments.

Before arriving at a conclusion as to the current position of the debtor's estate, the mortgage and tax obligations must be identified. The Manchester property is encumbered by a first mortgage in excess of $163,000 and past due real estate taxes, as of June 24, 1981, of $26,439.19. Thus, using the $395,000 market value figure, no more than $205,560 is available for satisfaction of the claims secured by attachments. With respect to the California Street property, the parties stipulated that the total pay-off figure on the mortgage as of June 15, 1981 is $238,369.48 and the per diem is $64.79.[7] Using the debtor's market valuations of $100,000 and $250,000, this property at best can do no more than satisfy the first mortgage.

As to the third property, the Butler building which the debtor valued at $40,000, the debtor's schedules show the amount of $29,637.42 as due the mortgagee.

The debtor's residence in Swanzey Lake is encumbered by two mortgages. The pay-off figure as of June 15, 1981 on the first mortgage was $41,913.93 ($7.75 per diem) and $57,676.34 on the second mortgage

---

5. Schedule B–2 (Personal Property) lists assets of only $18,500, $3,500 of which is in the nature of exempt property and $15,000 of which is a contingent and unliquidated claim against one Daniel Cunningham.

6. The debtor disputes the value of the claims underlying these attachments and thus has not stipulated to the amount.

7. Applying this per diem rate, another $14,512.96 is required as of January 25, 1982 to pay off the mortgage.

($20.16 per diem). Adopting the debtor's market value figure of $90,000 leaves the debtor with a negative equity of $9,590.27 as of June 15, 1980.[8]

In sum, the amount of "equity" that the debtor has in all his real property after satisfaction of mortgages and taxes is approximately $216,000[9] and this "equity" is more than consumed by the $300,000 Paccar attachment lien on all the debtor's real estate. Moreover, these figures represented the economics of the estate as of the spring and summer of 1981. Interest on the secured debt has been accruing daily, taxes continue to come due, and insurance and other costs assessable to the debtor are being incurred by mortgagees. The Court can only conclude that the position of secured creditors is further deteriorating with the passage of time.

It is also clear that there is no reasonable likelihood of rehabilitation. The debtor has no unencumbered assets which might serve as the collateral for refinancing. There has been no evidence as to any source of additional capital.[10] Two potential sources of cash flow, the debtor's earned income and the rental income from his three business properties, are not viable here. The debtor's earned income, according to his testimony, is only $15,000 and is more than exhausted by his ordinary living expenses which, as reported by the debtor in his proposed Chapter 13 plan, exceed $20,000. As for rental income, the debtor over the course of this Chapter 11 proceeding has shown an inability or disinclination to realize on this source. Except for the Manchester property which the debtor asserted could produce $5000 to $6000 a month in rental income,[11] the debtor made no attempt to demonstrate to the Court the in-come-producing capacity of his various properties and the sufficiency of the income to rehabilitate the debtor. To the contrary, the evidence showed that the debtor was permitting the two most valuable properties, the Manchester property and the California Street property, to be used by Linehaul Express and Nessy Leasing, respectively, businesses controlled by relatives of the debtor. The debtor has made no effort to collect rent and the president of Linehaul Express testified that Linehaul did not have the financial capacity to pay rent.

The Court finds that the debtor has no demonstrable equity in his assets, is continually suffering loss and diminution of his assets, has cash flow which is insufficient to service even current obligations on his secured debt, and that there is no reasonable likelihood of rehabilitation and thus conversion to Chapter 7 under 11 U.S.C. § 1112(b)(1) is proper.

(B) The debtor's demonstration of bad faith.

The nine statutory grounds listed in 11 U.S.C. § 1112 for dismissal or conversion of a Chapter 11 proceeding are not exclusive. Section 1112(b) requires only a showing of "cause" and "cause" can consist of a finding of "a lack of good faith" on the part of the debtor. *In re G–2 Realty Trust*, 6 B.R. 549, 552 (Bkrtcy.D.Mass.1980).

Paccar argues that the debtor has continuously during the course of this proceeding, and in the prior Chapter 13 proceeding, demonstrated bad faith. Paccar points to the dilatoriness with which a plan was filed in the Chapter 13 proceeding[12] and with which the schedules of assets and liabilities

---

8. Applying the per diem rates, an additional $1736.00 is due on the first mortgage as of January 25, 1982 and an additional $4515.84 is due on the second mortgage, leaving a negative equity of $15,842.11 for the debtor.

9. $205,560 in the Manchester property
$10,000 in the Butler building

10. Debtor's counsel did represent that the Cheshire County Savings Bank had made a financing commitment in the sum of $500,000 but this representation was never confirmed by affidavit of the Bank, despite statements to the Court by the debtor's counsel that an affidavit would be forthcoming.

11. The Craft appraisal (at pages 51–55) estimated the fair monthly rental of this property to be $3,000.

12. The Chapter 13 petition was filed on July 22, 1980 and a plan was filed September 2, 1980.

were filed in the Chapter 11 proceeding [13]; the debtor's failure to list in his Chapter 13 schedules all lines on his real estate while proposing to fund his Chapter 13 plan from equity in his real estate; the debtor's failure to list in his Chapter 11 schedules substantial liens and unsecured debts [14]; the debtor's failure to list a substantial asset in his Chapter 11 schedules [15]; substantial increases, without reasonable justification, in the valuations placed by the debtor on his real estate in the Chapter 11 schedules as compared to the Chapter 13 schedules [16]; the debtor's failure to collect rent from the parties occupying his real properties; the debtor's failure to attend court hearings; and the debtor's asserted lack of knowledge about the contents of the schedules and statement of financial affairs bearing his signature, as evidence of the debtor's lack of good faith in the conduct of the bankruptcy proceeding.

From the Court's viewpoint the debtor's attitude is typified by his failure to provide either the Court, the United States Trustee, or his creditors any reliable information on his financial affairs. The debtor's explanation for not complying with Paccar's subpoena of books and records was "there are no written books and records".[17] The debtor testified he did not even know what his earned income for 1980 was. The debtor's accountant testified on June 29, 1981, that he did not have any financial records for the debtor for the calendar year 1980. In an affidavit dated August 7, 1981, the accountant stated that he still was not in possession of any documents or substantive information concerning the debtor's 1980 or 1981 financial affairs, with the exception of communication, with taxing authorities regarding extensions. At the August 10 hearing counsel to the United States Trustee orally joined in Paccar's motion to convert, stating as his reason the debtor's failure to even marginally comply with the reporting requirements of the United States Trustee.[18]

█ The debtor's failure to maintain books and records can be grounds to dismiss or convert a Chapter 11 case to a case under Chapter 7. *In re Larmar Estates, Inc.*, 6 B.R. 933 (Bkrtcy.E.D.N.Y.1980). Creditors are entitled to more specific financial data than a self-serving memory from which to evaluate the debtor's financial condition and verify the debtor's statements. The production of records is a reasonable quid pro quo for the debtor's relief from substantial financial obligations. *In re Devine*, 11 B.R. 487 (Bkrtcy.D.Mass.1981). The sophistication of the records required depends on the complexity of the debtor's financial affairs. Here we have a debtor whose financial affairs include the conduct of businesses through five corporate entities,[19] ownership of three business properties exceeding $500,000 in value, and who lists secured debt in the amount of $547,764.42, unse-

---

**13.** The Chapter 11 petition was filed on March 18, 1981 and the schedules were filed on June 5, 1981.

**14.** Excluded were the Paccar and Thermo King Corporation attachments on the debtor's real property and the unsecured debt in an amount exceeding $200,000 arising from the debtor's personal guarantee of retail financing granted by Paccar to customers of the debtor's corporation.

**15.** This asset is the debtor's personal residence which the debtor had valued at $90,000 in his Chapter 13 schedules.

**16.** The Manchester property was valued at $400,000, and the California Street property at $100,000, in the Chapter 13 schedules. These properties were valued at $750,000 and $250,-000, respectively, in the Chapter 11 schedules.

**17.** Transcript of hearing, July 20, 1981, at p. 71.

**18.** The United States Trustee filed a formal motion to convert, or in the alternative for the appointment of a trustee, on August 27, 1981, setting forth as reasons (in part) the following: the debtor's failure to comply with the Operational Instructions and Reporting Requirements of the United States Trustee, the debtor's failure to appear and submit himself to a section 343 examination, and the statutory grounds defined by 11 U.S.C. § 1112(b)(1)–(3), the same statutory grounds asserted by Paccar.

**19.** H.P. Enterprises, Inc. d/b/a Big Wheels Truck Center; Peterbilt of New Hampshire, Inc., H.P. Rental & Leasing, Inc., Savon-Transportation, Inc.; and Harber Auto Village, Inc.

cured debt in the amount of $1,387,299.30 and priority claims against the estate in the amount of $253,264.88, and not even a record as elementary as a checkbook has been produced to document the sources and disposition of the debtor's assets and the bases of his liabilities over the past two years.

■ This Court noted in *Matter of K.C. Marsh Co., Inc.* that

> [o]ne of the basic policies of Chapter 11 is to provide the cover of the umbrella of the reorganization court to allow the debtor time to plan and reorganize its business practices, to rehabilitate a "sick business". 12 B.R. 401 (1981) at 404.

But when, as here, the debtor either kept no records from which its true financial condition might be ascertained or has concealed such records and even during the course of this lengthy Chapter 11 proceeding has not produced information that even marginally complies with the reporting requirements of the United States Trustee, such conduct constitutes bad faith sufficient to cause the Court to convert this case to a case under Chapter 7.

(C) Inability to Effectuate a Plan

The findings and conclusions of the Court to this point amply dispose of the conversion issue. However, because of its relevance to the question of the plaintiff's right to relief from the automatic stay, the Court will note its conclusions on the debtor's ability to effectuate a plan of reorganization.

Eighteen months have passed since the debtor sought the protection of this court through the filing of his Chapter 13 petition and ten months have passed since the Chapter 11 petition was filed. No plan of reorganization has been filed nor has the Court any basis for concluding that progress has been made toward the structuring of a plan[20]. The debtor argues that Paccar's efforts to convert the case and to obtain relief from the automatic stay have chilled potential sources of rehabilitation aid. As noted above, the debtor's counsel represent-

ed to the Court on August 12, 1981 that the Cheshire County Savings Bank stood ready to make available $500,000 to the debtor. The Court was informed that this representation would be verified by an affidavit from the Bank by August 21, 1981 but no such affidavit has been filed to date. This affidavit was to have addressed the conditions for bank financing and the application of the funds. Overlooking for the moment the lack of any verification, it would appear that the Bank would only be purchasing the Indian Head Bank's first mortgage and Paccar's mortgage. The net result would simply be that the Cheshire County Savings Bank would be substituted as the major secured creditor and the economics of the debtor's estate would remain unchanged. The debtor's assets, his real estate, would still be subject to encumbrances which exceed their value. Whether the debtor could gain the approval of all its secured creditors to a proposed plan, or provide the "indubitable equivalence" of their mortgages and liens to objecting secured creditors, is very doubtful.

Even putting that problem aside, the economic facts still preclude the possibility of the development of a plan within any reasonable amount of time. The principal thrust of Chapter 11 of the Bankruptcy Code is working out a plan that will benefit a debtor's unsecured creditors. This debtor has scheduled $387,299.30 in unsecured debt. Ahead of those claims are $253,264.88 in priority claims. There is no identifiable basis of payments to the unsecured creditors. If this estate were liquidated today the unsecured creditors, including those with priority status, would get nothing. Therefore, if there were ever to be a dividend for the unsecured creditors it would have to come from the debtor's future income. The debtor currently has a negative cash flow and has shown no effort at utilizing his assets to maximize income. Further, there is nothing in the record that demonstrates that the debtor's real property is even capable of generating sufficient

---

20. The debtor's counsel stated to the Court on August 12, 1981 that a plan would be filed before the last date for the filing of post-trial briefs. That date was September 4, 1981.

income to, first, service the secured debt and then provide a dividend. Throughout the ten months since this Chapter 11 was filed the debtor has been unable or unwilling to make profitable use of his property or even to operate it at a break-even level. The Court, seeing no realistic prospect of a dividend for unsecured creditors, sees no reason to allow, at the expense of the pocketbook of the mortgagees and other lien holders, additional time for rehabilitation efforts to be undertaken.

> Although the Debtor may have other ideas relative to a rehabilitation of [his] property, it is not appropriate that it be given choices *ad infinitum* to the continual delay and detriment of others . . . . The Court should give consideration to the prior conduct of the Debtor in reaching a determination of whether to allow the Chapter 11 proceeding to continue. . . . *In re Tolco Properties, Inc.,* 6 B.R. 482, 488 (Bkrtcy.E.D.Va.1980).

Given the economic facts in the life of this debtor and the pattern of conduct observed by the Court during the course of the Chapter 13 and Chapter 11 proceedings, the time for the debtor to get his house in order has run.

## II. RELIEF FROM STAY

■ Paccar seeks to modify the automatic stay pursuant to 11 U.S.C. § 362(d) to permit it to exercise its rights of foreclosure on the Manchester property with respect to either the first mortgage, which has been purchased by Paccar, or the judgment in Paccar's favor of $247,508, plus interest, secured by an attachment on this same property.

Under section 362(d)(2) relief from stay shall be granted

> with respect to a stay of an act against property, if—
>
> (A) the debtor does not have an equity in such property; and

21. Paccar contends that liquidation value is the appropriate standard in these circumstances. The appraisers did testify as to liquidation value. Mr. Bramley testified that liquidation value would be $300,000 at a foreclosure sale; Mr. Crafts testified that liquidation value would be "less than the appraised fair market value".

> (B) such property is not necessary to an effective reorganization.

The plaintiff has the burden of proof on the issue of the debtor's equity in the property and the debtor has the burden of proof on all other issues. 11 U.S.C. § 362(g).

The Court has concluded, for reasons set out in the discussion on the motion for conversion, that the effective reorganization of this debtor is not a reasonable possibility. Thus the question of whether the Manchester property is essential to reorganization is moot.

The only remaining question is whether the debtor has any equity in the Manchester property. Clearly he does not. The Court has found the fair market value of the Manchester property to be $395,000.[21] The evidence established the encumbrances on the Manchester property to be in the following amounts and order of priority:

| | |
|---|---:|
| Real estate taxes (as of 6/24/81) | $ 26,439.19 |
| Paccar's first mortgage (6/81) | 163,000.00 |
| Bickford attachment | 100,000.00 |
| Roberts attachment | 27,288.00 |
| Paccar judgment secured by $300,000 attachment – $247,508 plus interest at 6% from May 1979 (6/81) | 260,853.09 |
| | $577,580.28 |

Even if the Bickford and Roberts attachments are excluded on the basis that the debtor disputes the underlying claims, encumbrances totaling $450,292.28 would remain, a figure considerably in excess of the property's value as found by the Court. Further, it should be emphasized that these figures are as of June 1981 and interest has been accruing and compounding over the eight months since the figures were prepared.

Paccar having sustained its burden of proof on the issue of the debtor's lack of equity in the property, and the debtor hav-

Since the debtor's lack of equity in the property is clear even if the more generous fair market value standard is applied, there is no reason to decide the question of whether the liquidation standard is more appropriate.

ing failed to pursuade the Court that an effective reorganization is possible, Paccar's request for relief from the automatic stay will be allowed and Paccar permitted to enforce its security rights.