**In re ROUTE 202 CORPORATION, t/a Lionti's Villa, Debtor.**

**In re Filippo LIONTI and Carmela Lionti, Husband & Wife, Debtors.**

**Bankruptcy Nos. 82–01702K, 82–01703K.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 23, 1984.

Nelson J. Sack, Media, Pa., for debtors.

Esther L. Hornik, Philadelphia, Pa., for Underwriters of Lloyds, through J.H. Minet Co., Ltd. and Dominion Ins. Co.

Richard F. Stern, Jenkintown, Pa., for First Mortgage Co. of Pa.

Barbara L. Farley, Philadelphia, Pa., for Federal Leasing Corp.

## OPINION

WILLIAM A. KING, Jr., Bankruptcy Judge.

Two (2) related Chapter 11 cases come before the Court on two (2) motions to dismiss or convert the cases to Chapter 7 pursuant to 11 U.S.C. § 1112(b). Movants allege lack of good faith in filing Chapter 11 petitions, inability to effectuate a plan, and no reasonable likelihood of rehabilitation as factors warranting dismissal or conversion. Because identical issues are presented in each case, the motions were argued together and testimony taken at a hearing on March 8, 1983. After review of the record, we find that the evidence fails to support movants' allegations. Therefore, the motions to dismiss or convert will be denied in both cases.[1]

In addition to the motions to dismiss or convert, two (2) other issues bearing on the viability of these Chapter 11 cases were raised at the March 8th hearing. The first issue is whether the debtors' disclosure statement should be approved by the Court. After review of the disclosure statement, we find that it does not contain adequate information as required by § 1125 of the Code. Substantial amendments will have

---

1. This Opinion constitutes the findings of fact and conclusions of law required by Rule 7052 of the Rules of Bankruptcy Procedure.

to be made to the disclosure statement before approval can be granted.

The final issue before the Court is whether to allow the debtors to refinance by placing a senior lien on secured property. We have decided to postpone ruling on this matter until a hearing has been held on the status of the mortgagee's position. We will direct the Clerk's Office to schedule a hearing on this issue.

## FACTS

Filippo and Carmela Lionti ("The Liontis") filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code on April 16, 1982 on the eve of a foreclosure sale of their property by a secured creditor. The Liontis own a bar and restaurant at the intersection of Route 202 and Watkins Avenue in Chadds Ford, Pennsylvania, known as "Lionti's Villa". Route 202 Corporation is the business entity under which the bar and restaurant are operated. A Chapter 11 petition for Route 202 Corporation, of which the Liontis are officers and shareholders, was filed simultaneously with the Liontis' individual Chapter 11 petition.

The movants in these cases are First Mortgage Company of Pennsylvania, J.H. Minet & Company, Ltd., and Dominion Insurance Company. First Mortgage Co. is a mortgagee and secured creditor of the estate. J.H. Minet & Company, Ltd. and Dominion Insurance Company are insurance representatives of Lloyd's of London which were involved in insurance litigation with the Liontis and received a judgment on a counterclaim of $180,000. Although these companies are listed in the debtors' schedules as unsecured creditors, they have en-

tered into an assignment agreement with the mortgage company. Identical motions to dismiss or convert to Chapter 7 were filed jointly by all three (3) parties in both cases.

The Liontis have two (2) primary sources of income. One is a family construction company, known as Lionti & Sons Construction, which does residential building. The other source of income, and the subject of the present controversy, is the restaurant/bar business which became inoperative on September 20, 1978 when the single story building which housed the restaurant and bar was destroyed by fire. The building has been subsequently rebuilt by Lionti & Sons Construction on the same site as the original restaurant and bar. Financing for the new construction came from a number of sources, including loans from other family members,[2] and an extension of credit from a building materials supplier[3] who is secured by property owned by the debtors' daughter.[4]

The Liontis' assets at the time of the Chapter 11 filings consisted of two (2) residences in Delaware[5], the 2.2 acre tract of land in Pennsylvania on which the restaurant and bar are situated ("Chadd's Ford property") and miscellaneous items of personal property.

First Mortgage Company of Pennsylvania (one of the movants) holds a first mortgage on the Chadds Ford property. The amount due on the mortgage as of March 8, 1983 was approximately $328,000 plus late charges and attorneys fees.[6] Although no payments have been made since 1978,[7] the mortgage company received a lump sum payment of $180,000 in 1979 as insurance

2. N.T. pp. 51, 56.

3. Tri-County Supply Company of Chadds Ford, Pa. advanced lumber and supplies to the Liontis worth $52,500 as of March 1, 1983. N.T. pp. 98, 45–48, 22–23. See testimony of Tri-County's employee, A. Markland, N.T. pp. 92–112.

4. Testimony of Gina Lionti, N.T. pp. 51–54.

5. It is apparent that these two (2) residential properties are heavily encumbered, although the Court is uncertain as to exact amounts.

The debtors have disclosed first mortgages of $15,000 and second mortgages of $65,000 against these properties. The movants state in their proposed findings of fact against approval of the disclosure statement that Federal Leasing Corporation is in second position with liens against the residences in the amount of $67,000. First Mortgage Co. of Pa. holds third mortgages.

6. N.T. pp. 40, 42.

7. N.T. p. 41.

proceeds from the fire under the loss-payable clause of the Liontis' insurance policies. On April 12, 1979, shortly before the Liontis filed suit in federal court to recover $500,000 in insurance proceeds from a group of individual insurers, known colloquially as Lloyd's of London, First Mortgage Co. and the insurance companies executed a release and agreement of assignment under which First Mortgage Company was paid $180,000. This payment formed the basis for a $180,000.00 counterclaim by the insurance companies against the Liontis as subrogees of First Mortgage's rights. The insurance companies were in turn released from all claims due under the policies by First Mortgage. The agreement also contained a formula whereby the insurance companies would share in any recovery obtained by First Mortgage as a result of foreclosure on the Liontis' property.[8]

In the suit brought by the Liontis in federal court, the jury returned a verdict for the defendant-insurance companies. The District Court Judge ruled that there was sufficient evidence for the jury to find the fire was of suspicious "incendiary" origin; therefore, the jury's verdict would not be set aside.[9] It is on the basis of this judgment that J.H. Minet Company, Ltd. and Dominion Insurance Company hope to recoup some, if not all, of the $180,000 paid to First Mortgage Company. They claim that the $180,000 sum is properly includible in the amount owed First Mortgage Co. on the mortgage.

When the Chapter 11 petitions were filed on April 16, 1982, the mortgage company had already instituted foreclosure action. However, First Mortgage Company's request for relief from the automatic stay was denied in an adversary proceeding before this Court[10] on the grounds that the Liontis retained at least $45,000 equity in the property in Chadds Ford and that the mortgage company's interest was additionally protected by second mortgages on the Liontis' two (2) residential properties in Delaware. The Court found the fair market value of the Chadds Ford property at the time to be approximately $215,000.[11] Applying the $180,000 payment against the mortgage company's claim of approximately $350,000, the Court held that the amount due and owing to the plaintiff was $170,000, or $45,000 less than the value of the Chadds Ford property. The Court also ordered that a hearing be held in approximately ninety (90) days to review the matter and determine if the mortgagee's secured position had diminished.

The sole assets of Route 202 Corporation are a liquor license purchased for $60,000 in 1976 and valued in the Chapter 11 Schedules at $100,000, $300 cash on hand, and $1,000 on deposit with the Philadelphia Electric Company. The liquor license is also subject to a security interest held by First Mortgage Co. of Pa.

Both debtors have filed a disclosure statement and plan of reorganization which the movants vigorously oppose.[12] Success of

**8.** N.T. p. 43.

**9.** Lionti v. Lloyd's Insurance Co., No. 79–2034, slip op. (E.D.Pa. March 6, 1981).

**10.** Adversary proceeding No. 82–1148K, decided February 8, 1983.

**11.** The Court adopted the testimony of the mortgage company's real estate appraiser, although the debtors' expert witness estimated the property to be worth $450,000.

**12.** On November 22, 1982, a plan of reorganization was filed and docketed in the case of Filippo and Carmela Lionti. Although counsel obviously intended that the same plan would be filed and docketed in the Route 202 Corpora-

tion case, it has never been docketed. The disclosure statement was filed two (2) months later on January 21, 1983, and again only docketed in case no. 82–01703K. The movants, First Mortgage Co. of Pa., J.H. Minet Ltd., and Dominion Insurance Co., filed objections to the plan, which appear on both dockets, on January 5, 1983, but never filed objections to the disclosure statement. Therefore, the movants had no standing to object to the disclosure statement at the March 8, 1983 hearing when the application to approve the disclosure statement was considered by the Court. Nevertheless, they did file proposed findings of fact, conclusions of law and memorandum of law opposing the debtors' disclosure statement and plan of reorganization on May 2, 1983, pursuant to a Court-entered briefing Order.

the plan is contingent upon refinancing the Chadds Ford property, granting replacement liens to creditors on property owned by Gina Lionti, debtors' daughter, and profits from the building business and restaurant/bar business. The Liontis have filed a motion pursuant to 11 U.S.C. § 364(d)(1) seeking Court permission to borrow the sum of $120,000 as provided for in the plan. Under § 364(d)(1) the Liontis must prove they are unable to obtain credit other than by granting a superpriority lien to the new lender in order to subordinate the lien held by First Mortgage Co. on the Chadds Ford property. In the absence of agreement by First Mortgage to subordinate its lien, the Court must also find that there is adequate protection for the existing lienholder before a superpriority lien can be granted to the new lender.

At the March 8, 1983 hearing, the Liontis produced evidence regarding the availability of refinancing from an officer of a financial brokerage firm.[13] The witness testified that he had secured a guaranteed loan commitment of $120,000 for the debtors contingent upon Court approval of granting the lenders a first position on the Chadds Ford property.[14] The terms of the loan would be as follows: fifteen (15) year amortization with a balloon payment at the end of three years at 19¼ percent interest, plus a 5% brokers fee and a 5% lenders fee due at settlement.[15] The witness also testified that $55,000 would be made available immediately to the Liontis for start-up costs of the restaurant/bar business, as part of the $120,000 loan.[16]

No testimony was presented at the hearing on how the balance of the loan proceeds will be applied. However, the plan provides for immediate payments of $40,000 to First Mortgage Co. and Underwriters of Lloyd's[17] and $9,480 to administrative and priority claimants out of the $120,000 loan proceeds.[18]

The plan further proposes payments of $350 per month over the balance of the plan to the mortgagee and insurance companies from profits of the restaurant/bar business. An additional $20,000 will be paid to them upon completion and sale of a residential home owned by Gina Lionti in Hockessin, Delaware.[19] The two (2) residential proper-

---

13. Robert L. Cleveland testified that he was a loan broker with New Hope, Inc., having eight years of experience in obtaining commercial loans for companies. He based the loan commitment on a five year pro forma computer print out which showed a weekly income of $50,000 for the first year of business, based on percentage of occupancy. The seating capacity of the restaurant and bar were projected at 350 and 50 respectively. He also investigated the Liontis' credit rating, which he found to be generally good, and he obtained a character reference and profit and loss statements for Lionti & Sons Construction. He did not check the Liontis' judgment record nor did he verify Gina Lionti's statement that the gross income of the restaurant/bar was $190,000 during the nine months preceding the fire in 1978. N.T. pp. 132–147.

Included in the loan broker's testimony was the statement: "Given the location that the bar is at and my experience with bars, there is no doubt in my mind that the place is a gold mine." N.P. p. 136.

14. N.T. p. 131.

15. N.T. pp. 131, 140; see also letter from witness as Debtors' Exhibit No. 1. The monthly installment payments on this loan would be approximately $2,041.37. The amount due at the end of three (3) years would be $114,360.00.

16. N.T. p. 132. The plan provides that $55,000 of the $120,000 loan will be used to complete the restaurant/bar so that the business can reopen.

17. First Mortgage Co., J.H. Minet Co., Ltd., and Dominion Insurance Co. are treated as one entity, the secured creditor, under the plan. They are listed under Class II claims with Federal Leasing Corporation.

18. Claims under Class I "Administrative Claims and Interests" include legal fees of $850, accounting fees of $1,430, salaries of $2,000 for the Liontis, real estate taxes of $1,500, and Pennsylvania sales and unemployment taxes of $2,700.

19. Gina Lionti, debtors' daughter, has offered as replacement liens a total of 16 lots, 13 of which are located in Bethel Township, Pennsylvania, and 3 of which are located in Hockessin, Delaware. A house is being built on one of the lots in Hockessin, Delaware, which debtors propose to sell under the plan.

ties [20] owned by the debtors will also be sold and $20,000 of the proceeds paid to First Mortgage Co. and the insurance companies. The total amount proposed as settlement of movants' claims in the plan is $80,000, including costs and attorney's fees.

## CONCLUSIONS OF LAW

■ Section 1112(b) of the Bankruptcy Reform Act of 1978 ("Code") authorizes the Court on request of a party in interest and after notice and hearing, to dismiss or convert a Chapter 11 case for "cause". Cause may include one of the nine (9) statutory grounds set forth under § 1112(b)(1)–(9) or some other factor, such as lack of good faith on the part of the debtor. Any of these factors alone is sufficient for dismissal or conversion except continuing loss to or diminution of the estate and no reasonable likelihood of rehabilitation must be shown to exist together in order to constitute "cause" under § 1112(b)(1). *In re Spenard Ventures, Inc.,* 18 B.R. 164 (Bkrtcy.D.Alaska 1982); *In re Pappas,* 17 B.R. 662 (Bkrtcy. D.Mass.1982); *In re Victory Construction Co., Inc.,* 9 B.R. 549 (Bkrtcy.C.D.Cal.1981); *In re Dutch Flat Investment Co.,* 6 B.R. 470 (Bkrtcy.W.D.Cal.1980); *In re Tolco Properties,* 6 B.R. 482 (Bkrtcy.E.D.Va.1980).

Movants assert three (3) grounds for dismissing or converting these two (2) cases to Chapter 7: (1) bad faith; (2) continuing loss or diminution of the estate and absence of a reasonable likelihood of rehabilitation; and (3) inability to effectuate a plan.

As evidence of debtors' bad faith, movants point to the fact that the Chapter 11 petitions were filed to prevent foreclosure on the Chadds Ford property where the new restaurant was being built. They argue that Chapter 11 is not an appropriate vehicle for these debtors because neither petition filed represents a *bona fide* business in operation, i.e., the restaurant/bar business has been "defunct" since 1978 and Chapter 11 is not appropriate for individuals. In addition, bad faith is demonstrated, movants claim, by the fact that Gina Lionti has a significant amount of control over the debtors' operations, yet her assets are not included in the bankruptcy petitions, and are thus "shielded" from creditors.

On the issues of loss or diminution to the estate, absence of reasonable likelihood of rehabilitation and inability to effectuate a plan, most of movants' arguments rest on events prior to the Chapter 11 filings. They assert that debtors will not be able to manage the new restaurant/bar profitably once it reopens or meet the terms of the proposed loan,[21] based on their past performance record. Movants urge the Court to consider the findings of the trial court from the insurance litigation that the debtors were in precarious financial shape during the days preceding the fire. They point to the lack of business expertise on the part of both Mr. and Mrs. Lionti, who were shown to know little about the business operations at the hearing, and their daughter, Gina, who was manager of the old restaurant/bar and is manager of the new one.

Finally, movants contend that Liontis have no equity in their property now if the $180,000 judgment for the insurance companies is taken into account in the amount owed First Mortgage Co.; therefore, adequate protection is lacking under § 364(d)(1) and the superpriority lien of $120,000 should not be granted. Without the $120,000 loan, it necessarily follows according to movants' argument that the plan will not be confirmed because debtors have no assets to effect a cram down.

---

**20.** These properties are located at 1831 Walter Drive and 2615 Chincilla Drive in Wilmington, Delaware, and jointly valued in the plan at $142,000. A liquidation payment of $35,000 on the $67,000 claim of Federal Leasing Corporation will be paid out of proceeds from the sale of these homes, plus $15,000 to liquidate the first mortgages which are currently being paid outside the bankruptcy estate by other family members. Any balance will be applied to Class III unsecured claims totaling $25,677.

**21.** From the facts stated, it is clear that income from the restaurant/bar business will be used to service debt in excess of $2,000 per month, pay expenses, and pay a $350 per month dividend to the secured creditor.

■ Our review of several cases where bad faith was alleged as grounds for dismissal or conversion leads us to conclude there is insufficient evidence of bad faith in the instant Chapter 11 cases.

In *In re Pappas, supra* 17 B.R. at 668, bad faith was found where "the debtor either kept no records from which its true financial condition might be ascertained or has concealed such records and even during the course of this lengthy Chapter 11 proceeding has not produced information that even marginally complies with the reporting requirements of the United States Trustee".

The Court in *In re Dutch Flat Investment Co., supra* 6 B.R. at 471, found that the subject Chapter 11 cases were not filed in good faith because (1) the debtor corporations were organized immediately prior to the filings of the petitions for the sole purpose of forestalling the secured creditor while avoiding submitting the assets of the parent entities to the jurisdictions of the Court; (2) debtors had no assets other than equity in notes pledged as security to the secured creditor; and (3) debtors had no ongoing business, no employees and no unsecured creditors other than a nominal amount owed to accountants.

Many cases have held that dismissal is proper when a dummy entity is created for the purpose of obtaining a stay. *In re Dutch Flat, supra.* But where the debtor is motivated by a legitimate reorganization purpose and not solely or predominantly by the desire to prevent foreclosure or hinder creditors, bad faith is not present. *In re Spenard Ventures, Inc., supra* 18 B.R. at 167.

In *Spenard,* creditors alleged that the debtor-corporation was merely a corporate shell, formed not for any legitimate business purpose, but only to obtain a stay of a foreclosure sale and hinder creditors from reaching their collateral. After weighing all factors present in the case, the Court found the Chapter 11 petition was filed for a legitimate purpose—to arrange the debts of the business through refinancing or new capital investment. "Even liquidation through sale of assets might be a legitimate purpose of a Chapter 11 proceeding" under § 1123(b)(4). *In re Spenard Ventures, Inc., supra.* Similarly, the Court in *In the Matter of Northwest Recreational Activities, Inc.,* 4 B.R. 36 (Bkrtcy.N.D.Ga.1980) found that a new corporation formed on the same day that the Chapter 11 petition was filed and the day before a foreclosure sale was to occur was created for a legitimate business purpose and not to wrongfully delay or defraud creditors.

■ The filing of a bankruptcy petition on the eve of a scheduled foreclosure sale is not sufficient by itself to constitute bad faith unless it can be shown that the business entity under which the debtor is operating has no valid business purpose.

In the instant Chapter 11 cases, both the Liontis and Route 202 Corporation filed Chapter 11 petitions to reorganize the restaurant/bar business which opened in 1976 and lay dormant from 1978 until now. In the interim, substantial activity has taken place. At all times, the debtors have shown an intent to reopen the business as well as the capability and resources to do so.

At the March 8th hearing, there was evidence that the construction was substantially completed with the exception of installation of heating and air conditioning equipment and interior finishing. Gina Lionti, contrary to movants' assertions that she was shielding her assets, put up her property as collateral for credit she obtained from a building materials and lumber supply company. In addition, she invested her own money into the rebuilding of the restaurant/bar which was done by her family's construction company.[22] At the March 8th hearing, she gave testimony that a music equipment vendor was willing to advance the Liontis $5,000 in cash which she was going to use for buying liquor and food for the first week.[23] Debtors also produced testimony at the hearing that an additional source of capital was available if approved

---

**22.** N.T. p. 56.

**23.** N.T. p. 48.

by the Court.[24] In summary, there was sufficient testimony at the hearing to convince the Court that the business would soon be in operation again and that it was not the "defunct" entity which movants asserted it was.

These two (2) Chapter 11 cases are readily distinguishable from the situation in *In re Tracey Service Co., Inc.,* 17 B.R. 405 (Bkrtcy.E.D.Pa.1982) where this Court converted the case from Chapter 11 to Chapter 7. In *Tracey Service,* the debtor corporation had no premises, no inventory, no equipment, no employees, no office and no phone. All of the assets were encumbered or subject to litigation. Accounts receivable were not being collected and no income was being generated. Real estate taxes and interest on the mortgaged property continued to accrue. Corporate records had been lost in a distress sale. We noted that "it is difficult to imagine a more difficult situation in which to formulate a plan of reorganization." 17 B.R. at 408.

■ Movants were also unable to prove that Gina Lionti is shielding her assets from the bankruptcy estate. While not a party to the bankruptcy proceedings, Ms. Lionti has offered her properties in Bethel Township, Pennsylvania, and Hockessin, Delaware, as replacement liens in the plan of reorganization filed by the debtors.

One chief purpose of a Chapter 11 reorganization, protection of unsecured creditors, is also present here, further negating movants' assertions of bad faith. *Cf. In re Dutch Flat Investment Co., supra.*

■ An alternative ground for dismissing or converting these cases is "continuing loss to or diminuation of the estate and absence of a reasonable likelihood of rehabilitation" under § 1112(b)(1). However, the burden of showing continuing loss or diminution to the estate is on the creditor seeking relief. *In re Union County Wholesale Tobacco, Etc.,* 8 B.R. 439 (Bkrtcy.D.N.J.1981); *In re*

*Alves Photo Service, Inc.,* 6 B.R. 690 (Bkrtcy.D.Mass.1980).

One consideration of the "continuing loss to or diminution of the estate" standard concerns whether actual depreciation in the value of the property of the estate exists. *In re Tolco Properties, Inc., supra* 6 B.R. at 487. Other guidelines for the Court have been suggested as follows:

"Obviously, if the debtor has a negative cash flow after entry of the order for relief in the chapter 11 case, the first of two elements of section 1112(b)(1) is satisfied. Section 1112(b)(1) does not, however, specify that only cash losses are to be considered. Although the debtor may have a positive cash flow, the court should consider whether the debtor is suffering a loss by reason of actual depreciation in the value of property of the estate. The continuing loss or diminution standard set forth in section 1112(b)(1) requires the court to consider depreciation of assets in the economic, rather than accounting sense. A debtor which is operating at a loss according to generally accepted accounting principles may not fall within the 'continuing loss' or 'diminution of the estate' standards if it can be established that the value of the debtor's assets is appreciating rather than depreciating." 5 Collier on Bankruptcy ¶ 1112.03[2][c][i] (15th ed. 1979).

*In re Tolco Properties, Inc., supra.*

■ Movants offered no testimony at the March 8th hearing to show that the values of the Chadds Ford property or other properties of the estate were depreciating. On the other hand, debtors offered substantial evidence that value was being added to movants' security by the construction and rebuilding in process on the Chadds Ford property.[25] One witness testified that the restaurant/bar is located in a growing area with a significant amount of commercial

---

**24.** Movants have themselves observed: "In the instant matter before the Court, the Liontis have demonstrated that they have a marvelous ability for acquiring credit." Memorandum of Law of Movants in support of Motion for dismissal or conversion, p. 5.

**25.** N.T. pp. 62–65.

activity.[26] Movants clearly were unable to meet the burden of proving continuing loss to or diminution in value of the estate.

■ The debtors addressed movants' arguments regarding lack of management ability by presenting testimony from an expert witness who stated that he would be available to the debtors for financial advice and advice on managing the new bar.[27] Although the witness was unable to use specific facts from the restaurant/bar in question, he did predict that sufficient funds would be available to amortize a debt with payments of $2,000 per month based on national surveys of a restaurant/bar with the same seating capacity.[28]

In conclusion, the debtors presented sufficient testimony to rebut the argument of movants that the new restaurant will be poorly managed and unprofitable. Prior mismanagement of a business before a Chapter 11 petition is filed should not hinder attempts by the debtor to make a fresh start. It has been stated that:

"[o]ne of the basic policies of Chapter 11 is to provide the cover of the umbrella of the reorganization court to allow the debtor time to plan and reorganize its business practices, to rehabilitate a 'sick business'."

*In re K.C. Marsh Co., Inc.,* 12 B.R. 401, 404 (Bkrtcy.D.Mass.1981).

The underlying policy of reorganization proceedings is "to save a sick business, not to bury it and divide up its belongings." *In re Flying W Airways, Inc.,* 341 F.Supp. 26, 99 (E.D.Pa.1972).

Therefore, it is only when reorganization is no longer a realistic and viable undertaking that the debtor should be removed from the cover of the "umbrella of the reorganization court." *In the Matter of Maplewood Poultry Co.,* 2 B.R. 545, 549 (Bkrtcy.D.Me.1980).

■ Finally, these Chapter 11 petitions should not be dismissed or converted for failure to effectuate a plan. Debtors have proposed a plan which has yet to be acted on by the Court or the creditors. In the plan, debtors have proposed a sale of their residential homes as well as other means of satisfying their debts. It would be premature for the Court to rule that debtors have been unable to effectuate a plan when the debtors' primary method of achieving reorganization, refinancing, has not yet been decided by the Court.

In conclusion, we find that there is at least a reasonable possibility that these debtors will be able to reorganize. The debtors' reorganization has not been shown to be a hopeless and unrealistic prospect at this stage.

The Court has decided to hold a status hearing before ruling on debtors' motion to incur new debt under § 364(d). Issues to be considered at this hearing will be the market value of the property on which movants are secured and whether adequate protection exists for the secured parties. A hearing was scheduled for May 3, 1983 on the status of the secured party's position in our Order of February 8, 1983 denying First Mortgage Co. relief from the automatic stay. That hearing was never held, providing a valid reason for holding a status hearing at this time.

■ The third issue before the Court, approval of the debtors' disclosure statement, requires the Court to examine whether adequate information has been provided in the disclosure statement to enable creditors and other holders of claims to make an informed judgment about the plan. 11 U.S.C. § 1125. The litigation between the debtors and the insurance companies must be revealed in full detail in the disclosure statement as well as any new developments which have taken place since the disclosure

---

**26.** N.T. pp. 88–89.

**27.** J.K. McCreesh was offered as an expert witness on the profitability of restaurants and bars, based on his experience with restaurants and bars and his accounting and real estate backgrounds. He stated that he will be available to help out with bookkeeping, accounting and tax preparation for a nominal fee. N.T. pp. 73–86.

**28.** N.T. pp. 74–76.

**376**

statement was filed on January 21, 1983. Therefore, we will direct the debtors to file an amended disclosure statement in each case reflecting any developments which have taken place since January 21, 1983, highlighting in particular the status of the appeal before the Third Circuit on the insurance proceeds.